Russell H. BRANDON, Trustee, et al.,
Appellants,

v.

S. S. DENTON, Her Engines, Etc.,
Appellee.

No. 18899.

United States Court of Appeals
Fifth Circuit.

April 10, 1962.

T. G. Schirmeyer, L. G. Kratochvil, Houston, Tex., Horace Gray, Gray & Wythe, New York City, for Augusta Oil Bunkering, S.p.A.

Jack H. Taylor, Houston, Tex., Chas. B. Smith, Galveston, Tex., Malant, Martin, Rafferty, Taylor & Kepner, Houston, Tex., for appellants MEBA Pension & Welfare Plan and MEBA Tanker Vacation Plan.

Newton B. Schwartz, Schwartz & Lapin, Houston, Tex., for Russell H. Brandon, trustee, et al., William G. Mullins, trustee, et al., and Seafarers Sea Chest Corp.

Robert Eikel, Thomas A. Brown, Jr., Houston, Tex., Theodore Goller, Jr., Houston, Tex., of counsel, for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and RIVES, Circuit Judges.

RIVES, Circuit Judge.

Meridian Trading Corporation, hereafter Meridian, filed its libel seeking foreclosure of a preferred mortgage, so classified under the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911 et seq. Augusta Oil Bunkering, S.p.A., hereafter Augusta, intervened to protect and foreclose a maritime lien for fuel oil or bunkers furnished the vessel at the Port of Augusta, Sicily. The other appellants filed either intervening libels or original libels which were consolidated with the libel filed by Augusta, in which they sought to enforce claims on behalf of various special funds set up to promote the welfare of seamen, upon the theory that such claims were secured by preferred maritime liens under 46 U.S.C.A. § 953 "for wages of the crew of the vessel."

The district court, pursuant to its Local Admiralty Rule 23, appointed a Commissioner to ascertain the amounts due to the libellants and the priorities thereof and to report to the Court. The Commissioner rendered a very able, full and comprehensive report. The district court overruled the various exceptions to the Commissioner's report and entered its final decree accordingly. The present appeals followed.

Meridian's mortgage on the Tankship (T/S) Denton made to secure a debt in the original principal amount of $400,000.00, and on which there is past due and owing more than $300,000.00, was perfected on January 16, 1959, as a valid Preferred Mortgage under the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911 et seq. That fact is not contested by any of the appellants.

The ship was sold by the United States Marshal for the sum of $216,-000.00, and, after payment of the Marshal's costs and an uncontested earned wage claim, the balance of that sum was $206,281.90, much less than the balance due on the original debt secured by Meridian's mortgage. The Commissioner found that:

"The valid amounts of claims established by the evidence are as follows:

| | |
|---|---|
| Meridian Trading Corporation | More than $300,000.00 |
| Augusta Oil Bunkering S.p.A. | $11,976.04 |
| Joseph A. Quinn | 1,634.81 |
| Egbert C. Palmer | 668.68 |
| MM&P Pension & Welfare Plan | 3,375.45 |
| MM&P Tanker Vacation Plan | 12,228.27 |
| SIU Pension & Welfare Plan | 10,560.06 |
| SIU Vacation Plan | 11,518.82 |
| MEBA Pension & Welfare Plan | 2,711.76 |
| MEBA Tanker Vacation Plan | 11,552.32 |
| ROU Pension & Welfare Plan | 532.25 |
| ROU Vacation Plan | 1,250.00 |
| Plan of Atlantic & Gulf Contract Companies | 486.77 |
| | |
| Total exclusive of Meridian's claim | $68,495.23" |

Augusta argues that the priority of the mortgage was waived because Meridian did not prove that Augusta was given notice of the existence of the preferred ship mortgage prior to the time it furnished bunkers to the vessel as required by the statute, Section 923 of Title 46 U.S.C.A.:

"§ 923. *Certified copies of mortgage; exhibition*

"The collector of customs upon the recording of a preferred mortgage shall deliver two certified copies thereof to the mortgagor who shall place, and use due diligence to retain, one copy on board the mortgaged vessel and cause such copy and the documents of the vessel to be exhibited by the master to any person having business with the vessel, which may give rise to a maritime lien upon the vessel or to the sale, conveyance, or mortgage thereof. The master of the vessel shall, upon the request of any such person, exhibit to him the documents of the vessel and the copy of any preferred mortgage of the vessel placed on board thereof."

A similar contention made by a domestic supplier was decided by this Court adversely to the supplier. Pascagoula Dock Station v. Merchants & Marine Bank, 5 Cir., 1959, 271 F.2d 53, 55–56.

Another section provides as a condition to the preferred status of the mortgage that:

"(1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;

\* \* \* \* \* \*

"(c) There shall be indorsed upon the documents of a vessel covered by a preferred mortgage—

"(1) The names of the mortgagor and mortgagee;

"(2) The time and date the indorsement is made;

"(3) The amount and date of maturity of the mortgage; and

"(4) Any amount required to be indorsed by the provisions of subsection (e) or (f) of this section.

"(d) Such indorsement shall be made (1) by the collector of customs of the port of documentation of the mortgaged vessel, or (2) by the collector of customs of any port in which the vessel is found, if such collector is directed to make the indorsement by the collector of customs of the port of documentation; and no clearance shall be issued to the vessel until such indorsement is made. The collector of customs of the port of documentation shall give such direction by wire or letter at the request of the mortgagee and upon the tender of the cost of communication of such direction. Whenever any new document is issued for the vessel, such indorsement shall be transferred to and indorsed upon the new document by the collector of customs." 46 U.S. C.A. § 922.

The Supreme Court held in Morse Dry Dock & Repair Co. v. Northern Star, 1926, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082, that such an endorsement upon the ship's papers is essential to give the mortgage preferred status over a subsequent lienor who did not have actual notice. The Commissioner in the present case overruled an objection based on the requirement of such an endorsement, and found that: "Since the filing of the objection \* \* \* Meridian filed a certified copy of the vessel's Permanent Certificate of Enrollment and License showing the mortgage was endorsed on the vessel's documents on January 16, 1959, at 9:00 p. m. at the Port of Jacksonville, Florida."

We agree with what is so well stated in Gilmore and Black on Admiralty at pages 589 and 590:

"In addition to recordation and indorsement the Mortgage Act sets a third requirement which may be dealt with under the head of 'public notice': the collector of customs, on recordation, is required to deliver two certified copies of the mortgage to the mortgagor who 'shall place, and use due diligence to retain, one copy on board the mortgaged vessel.' [287] Both the copy of the mortgage and the ship's documents are to be exhibited by the master to any person legitimately interested. The mortgagor is made liable to any person who suffers loss as a result of his failure to comply with the certified copy provision,[288] but it is hard to see how such loss could ever arise: if the indorsement on the ship's documents has not been made, the lienor or purchaser is protected by the Supreme Court's holding in the Northern Star case; if it has been made, he certainly knows of the mortgage and can hardly claim to have been misled because the certified copy was not with the ship's papers. The certified copy provision makes no kind of sense in view of the indorsement provisions. It has properly been held that the certified copy requirement is not jurisdictional, so that the mortgage does not lose its preferred status for noncompliance.[289]

---

"[287]  § 923.

"[288]  § 941(c).

"[289]  The Oconee, 280 F. 927 (E.D.Va.1921); The Frances C.

Denehy, 94 F.Supp. 807, 1951 A. M.C. 712 (D.Me.1950). In The Bethlehem, 4 F.2d 308, 1925 A.M.C. 569 (3d Cir. 1925) a mortgage was held not to be preferred where no certified copy was kept with the ship's papers, but the court also states that a search of the ship's documents would not have revealed the mortgage; thus it is apparent that no indorsement had been made, so that the mortgage would fail under the Northern Star case, supra note 285."

■ The present record is silent upon the question of what inquiry was made by Augusta concerning the existence of the mortgage, or whether Augusta had actual knowledge or notice of its existence at the time it supplied the bunkers. Since the mortgage was endorsed on the vessel's documents available for inspection upon request, Augusta was charged with notice of its existence. It follows that the priority of Meridian's mortgage has not been waived by failure to prove that the master exhibited a certified copy of the mortgage to Augusta before it supplied the bunkers; and Meridian's mortgage is a valid and existing preferred mortgage under the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911 et seq.

The mortgage was perfected on January 16, 1959. Augusta proved that on October 8 and 9, 1959 the master of the T/S Denton ordered and received the fuel oil or "Bunker C" aboard the vessel at Augusta, Sicily. To make out its claim for a preferred maritime lien, Augusta took the deposition of Doctor Enrico L. Pavia, a prominent member of the Italian Bar and a foreign law consultant. Dr. Pavia testified that the present basic text of Italian law relating to maritime liens on ships is a Code of Navigation which was enacted March 30, 1942; that Article 552 of that Code relates to maritime liens and Article 575 relates to the priority of such liens over ship mortgages. Excerpts of Articles 552 and 575 as produced by Dr. Pavia were introduced. The English translation of Article 552 in pertinent part provides:

"552: (Privileges on the ship and freight.)

"The following credits have privilege on the ship, on the freight of the voyage during which the credit arose, on the pertinencies of the vessel and on the accessories of the freight earned after the commencement of the voyage:

*　*　*　*　*　*

"6) The credits deriving from contracts stipulated and from operations carried out by the Master, by virtue of his legal powers even if he is Operator of the ship, for the exigencies of the conservation of the ship or for the continuance of the voyage."

The English translation of Article 575 reads:

"575. (Graduation of the mortgage in the concurrence with the privileges)—

"The mortgage takes rank following the privileges indicated in the Art. 552 and is preferred to any other general or special privilege."

Dr. Pavia further testified that the term "privileges" as used in Article 552 means "maritime liens." Dr. Pavia gave his opinion that, under Paragraph 6 of Article 552, "a person or firm or corporation supplying oil bunkers to an American vessel at a port in Italy at the request of the master of the vessel would be entitled to a maritime lien on such vessel." He further testified that by Article 575 " * * * such liens would be preferred over a mortgage."

"Q. You mean would have priority over a mortgage?

"A. That is right.

"Q. Under the Law of Italy?

"A. That is right."

It should be observed that Dr. Pavia did not designate the kind of mortgage

to which he referred. Upon cross-examination Dr. Pavia testified:

"Q. I believe you have also testified that if a United States ship were to be served with bunkers in Italy, and a proceeding brought against the vessel in Italy, that the Italian courts would give priority to the Italian lien over any/or American mortgage that might be on the ship?

"A. No. The Italian court would apply Article 6 of the preliminary rule, and apply the law of the Flag, the municipal law of the Flag, the substantive law of the Flag.

"Q. In other words, conflicting rules are generally applicable by Italian courts, the law of the Flag in conflict situations?

"A. On this particular subject, with specific reference to the law of the Flag.

"Q. Therefore is it fair to say that the Articles 552 and 575 of the Italian Navigation only in effect can apply under applicable Italian Law to Italian vessels being proceeded against in Italian courts by Italian claimants?

"A. An Italian court would apply the Italian law to an Italian vessel; American law to an American vessel; German law to a German vessel.

"Q. So that therefore the articles that we just discussed really only apply to an Italian vessel?

"A. They might apply to a vessel of another nation in the event that nation, for instance, was a party to the Brussels Convention.

"Q. Precisely, but that would be the only situation that would apply?

"A. That would be by way of reference to the law of the Flag.

"Q. In general conflict of the law, the rule would be the law of the Flag to be applied?

"A. That is right.

"Q. In Italy?

"A. In Italy an Italian court would apply the law of the Flag."

Again on redirect examination, Dr. Pavia testified:

"Q. Reference was made to this Article 6 of the law of the Flag. Would that Section 6 be part of what was known as the municipal law or substantive law of Italy, or is it a rule with respect to the conflict of laws?

"A. It is purely a law of reference, or a law of Renvoi.

"Q. The question as to whether the doctrine of Renvoi would be applied, is this dependent not upon the law of Italy, but upon the law of the place where the trial is held; is that correct?

"A. That is correct."

The Commissioner held that, " * * * regardless of the law applicable, Augusta acquired a maritime lien on the vessel by furnishing bunkers." That much is not contested, but, as was further noted by the Commissioner, "The priority is the matter of controversy here." The Commissioner found that the Italian law did not provide for priority of a lien for supplies over the preferred ship mortgage for a number of reasons. One of these was that it was not proved that "the mortgage" to which reference is made in Article 575 includes a preferred ship mortgage created under the Ship Mortgage Act of 1920. Another of the Commissioner's reasons included his disagreement with Dr. Pavia's testimony with reference to Section 6 of the Preliminary Code of Navigation of Italy prescribing application of the "law of the Flag" when Dr. Pavia testified on redirect examination that "it is purely a law of reference, or a law of Renvoi." [1]

---

1. The prevailing view rejecting renvoi is thus stated in Restatement of Conflicts of Laws, Section 7(b):

"where in making the choice of law to govern a certain situation the law of another state is to be applied, since the

The Commissioner, holding that "this testimony is a conclusion on the ultimate issue to be decided," reached an opposite result:

"It is seen then that Italy recognizes in detail the matters of public policy involved in applying the 'law of the flag' in maritime lien cases. It appears that Section 6 of the preliminary Code of Navigation of Italy is a statement of substantive or municipal law rather than a codified statement of the Italian rule of conflicts of law. Italy has left it up to each individual country to determine for itself whether a maritime lien is acquired on its vessels in Italy and whether that lien shall rank before or after a mortgage on the vessel. The application of the 'law of the flag' in Italy means that an Italian supplier of a foreign vessel acquires only such rights and priorities as the 'law of the flag' gives him and this provision is not purely 'a law of Renvoi'. The Italian Code of Navigation applies only to Italian vessels, the Brussels Convention to vessels of nations signatory to that Convention, and the 'law of the flag' applies to all other vessels. The SS DENTON was an American flag vessel and under the law applicable in Italy, the lien acquired by Augusta Oil Bunkering was inferior to the preferred mortgage held by Meridian Trading Corporation.

"The Italian Code of Navigation was enacted solely for the government of Italian flag vessels, and the provisions of preliminary section (6) is for the purpose of making plain in the Code itself that it does not apply to foreign flag vessels. Where Italy has allowed the Brussels Convention to apply to Italian flag vessels, it has done so only with reservations which render its maritime code substantially unchanged.

It was neither the purpose nor the result of the Italian Code of Navigation to render American flag vessels in Italian ports subject to the same priority provisions of the Brussels Convention which the United States has so steadfastly refused to accept since 1926."

■ If priority were to be determined in accordance with the law of Italy and if findings of foreign law were to be treated like findings of fact, then it would be difficult for this Court, under the rule of McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, to set aside the foregoing findings of the Commissioner which were adopted by the district court. We do not explore that subject, however, because we do not think that priority should be determined by the law of Italy when the question as to which is entitled to priority relates to a preferred ship mortgage perfected in the United States and a maritime lien which vested in Italy, and when the question must be determined by a court of the United States. Judge Brown expressed the rule in The Scotia, S.D.N.Y., 1888, 35 F. 907, 910, 911, as follows:

"Whether a lien created by the local law shall be recognized and enforced in another country upon the res when found and seized there, depends upon the law of comity. If the law of the latter country does not recognize any similar liens, as between its own citizens, it will not ordinarily enforce the foreign lien in favor of a foreigner to the prejudice of its own citizens. Liens and privileges, when enforced in other countries than in those by whose laws they are created, are largely treated as remedies; and, unless affecting foreigners alone, take rank according to the law of the forum."

Even earlier in a bankrupty case, Harrison v. Sterry and others, 1809, 5

only Conflict of Laws used in the determination of the case is the Conflict of Laws of the forum, the foreign law to

be applied is the law applicable to the matter in hand and not the Conflict of Laws of the foreign state."

Cranch 289, 298, 9 U.S. 289, 298, 3 L.Ed. 104, Chief Justice Marshall had said:

"The law of the place where a contract is made is, generally speaking, the law of the contract; *i. e.*, it is the law by which the contract is expounded. But the right of priority forms no part of the contract itself. It is extrinsic, and is rather a personal privilege, dependent on the law of the place where the property lies, and where the court sits which is to decide the cause. In the familiar case of the administration of the estate of a deceased person, the assets are always distributed according to the dignity of the debt, as regulated by the law of the country where the representative of the deceased acts, and from which he derives his powers; not by the law of the country where the contract was made. In this country, and in its courts, in a contest respecting property lying in this country, the United States are not deprived of that priority which the laws give them, by the circumstance that the contract was made in a foreign country, with a person resident abroad."

Judge Groner in The Oconee, E.D.Va., 1922, 280 F. 927, 933, ruled explicitly that the question of priorities must be determined by the law of the United States:

"It is, however, further urged on behalf of the foreign supply lienors that a mortgage cannot take precedence over a lien for supplies impressed by the laws of another country, since the act cannot have extra-territorial effect. In the case at bar the vessel in question was an American vessel, and 'Congress, having created * * * this species of property, and conferred upon it its chief value,' may also regulate and determine 'the rights * * * of all persons dealing therein.' White's Bank [of Buffalo] v. Smith, 7 Wall. [646] 656, 19 L.Ed. 211. Under the English maritime law neither of the foreign petitioners would have been entitled to a lien, and while under the maritime laws of the United States they would have been so entitled, Congress has, by the act in question, made such lien subordinate to that of the preferred mortgage, and petitioners seeking relief in an American court are bound by the law of the forum. The Scotland, 105 U.S. [24], at pages 31, 32, 26 L.Ed. 1001."

When we come to the law of the United States, it is clear that " * * * the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court." 46 U.S.C.A. § 953(b). The preceding subsection (a) defines the term "preferred maritime lien" so as not to include a lien for supplies arising *after* the time of the recording and endorsement of a preferred mortgage.

Augusta, however, makes a further and more persuasive argument based upon the Treaty of Friendship between the United States and Italy which became effective July 26, 1949, 63 Stat. 2255.[2]

---

2. The provisions of that Treaty upon which Augusta relies, with Augusta's emphasis supplied, are as follows:
Preamble:
"The United States of America and the Italian Republic, desirous of strengthening the bond of peace and the traditional ties of friendship between the two countries and promoting closer intercourse between the respective territories through cultural, economic and commercial aspirations of their peoples, have resolved to conclude a Treaty of Friendship, Commerce and Navigation *based in general upon principles of national and of most-favored-nation treatment in the unconditional form,* * * * "
Article I—Rights and Privileges—63 Stat. 2257
"The nationals of either High Contracting Party shall * * * be permitted, without interference, to exercise, in conformity with the applicable laws and regulations, the following rights and privi-

Until the enactment of the Ship Mortgage Act of 1920, 46 U.S.C.A. § 911 et seq., a mortgage on a ship was not a maritime contract and was not within the admiralty jurisdiction. Bogart v. The John Jay, 1854, 17 How. 399, 58 U.S. 399, 15 L.Ed. 95; Gilmore and Black, The Law of Admiralty, p. 568. The Ship Mortgage Act of 1920 did not, of course, cover all mortgages on all ships, but contained limitations with respect to the nationality of the ship, the citizenship of the mortgagee and the type of vessel. When the United States-Italian Treaty of Friendship became effective in 1949, the Ship Mortgage Act of 1920 did not cover mortgages on foreign flag vessels. Also, as has been noted, under the 1920 Act, any lien for supplies accruing after the recording and endorsement of a preferred mortgage ranked in priority behind that mortgage. 46 U.S.C.A. § 953. Lienors for supplies furnished in foreign ports could not then claim that they were treated any less favorably than lienors for supplies furnished in the United States. Documented foreign vessels themselves did, perhaps, have some cause for complaint, for mortgages upon such vessels could not be treated as preferred ship mortgages under the Act of 1920. It will be noted that Article XX of the United States-Italian Treaty of Friendship, footnote 2, supra, called for "Reciprocal Treatment of Vessels."

It was not, however, until some five years after the Treaty became effective that the Ship Mortgage Act of 1920 was amended so as to cover foreign ship mortgages. Approved June 29, 1954, 68 Stat. 323, there was added at the end of

leges *upon terms no less favorable than those now or hereafter accorded to nationals of such other High Contracting Party.*

"(a) to engage in commercial * * * activities * * *. Moreover, *the nationals of either High Contracting Party shall not in any case, * * * receive treatment less favorable than the treatment which is or may hereafter be accorded to the nationals of any third country.*"
Article V(4)—*Access to Courts*—63 Stat. 2262, 2263

"The nationals * * * of either High Contracting Party shall enjoy freedom of access to the courts of justice * * * of the other High Contracting Party, in all degrees of jurisdiction established by law, both in pursuit and in defense of their rights; * * * and shall be permitted to exercise all these rights and privileges, in conformity with the applicable laws and regulations, *upon terms no less favorable than the terms which are or may hereafter be accorded to the nationals * * * of the other High Contracting Party* and no less favorable than are * * * accorded to the nationals * * * of any third country."
Article XVII—*Financial Transactions*—63 Stat. 2280

"Nationals * * * of either High Contracting Party shall be accorded by the other High Contracting Party treatment no less favorable than are * * * accorded to nationals * * * of such other High Contracting Party * * * with respect to financial transactions * * *."
Article XVIII—*Equitable Treatment*—63 Stat. 2282

"Each High Contracting Party * * * in the purchasing of supplies, shall accord fair and equitable treatment to the nationals * * * and to the commerce of the other High Contracting Party as compared with the treatment which is * * * accorded to nationals * * * and to commerce of any third country."
Article XIX—*Open Ports*—63 Stat. 2284

"The vessels of either High Contracting Party shall have liberty * * * to come to all ports * * * of the other High Contracting Party which are * * * open to foreign commerce and navigation."
Article XX—*Reciprocal Treatment of Vessels*—63 Stat. 2284.

"(1) The vessels * * * of either High Contracting Party shall, within the ports * * * of the other High Contracting Party, in all respects be accorded treatment no less favorable than the treatment accorded to vessels * * * of such other High Contracting Party * * *.

"(3) * * * *no * * * conditions of any kind, shall be imposed in a way tending to accord any advantage to national vessels as compared with the vessels of the other High Contracting Party.*"

what is now 46 U.S.C.A. § 951 the following provision:

"Foreign ship mortgages: As used in sections 951–954 of this title, the term 'preferred mortgage' shall include, in addition to a preferred mortgage made pursuant to the provisions of this chapter, any mortgage, hypothecation, or similar charge created as security upon any documented foreign vessel (other than a towboat, barge, scow, lighter, car float, canal boat, or tank vessel, of less than two hundred gross tons) if such mortgage, hypothecation, or similar charge has been duly and validly executed in accordance with the laws of the foreign nation under the laws of which the vessel is documented and has been duly registered in accordance with such laws in a public register either at the port of registry of the vessel or at a central office; and the term 'preferred mortgage lien' shall also include the lien of such mortgage, hypothecation, or similar charge: *Provided, however, That such 'preferred mortgage lien' in the case of a foreign vessel shall also be subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States.* June 5, 1920, c. 250, § 30, Subsec. K, 41 Stat. 1003; June 29, 1954, c. 419, 68 Stat. 323." (Emphasis supplied.)

■ Legislative history, see 2 U.S. Code, Congressional and Administrative News, 83rd Cong., 2nd Sess., 1954, pp. 2451–2453, shows that the primary purpose of the 1954 amendment was to provide a more effective remedy to American holders of mortgages on foreign-flag vessels, and more particularly to the United States itself, which then held such mortgages securing balances aggregating about $125 million. In an excellent opinion of District Judge Crowe of the Canal Zone, Rederiaktierbolaget v. Compania De Navegacion, D.C.Canal Zone, 1955, 139 F.Supp. 327, 336, 373, it was decided that the 1954 amendment applied to foreign mortgagees as well as to American mortgagees.

Augusta's present contention emphasizes the concluding proviso of the 1954 amendment, which, for convenience, we have also emphasized in its quotation, supra. The source of that proviso is disclosed in 2 U.S.Code, Congressional and Administrative News, 83rd Cong., 2nd Sess., 1954, p. 2451:

"However, in order to provide assistance for American suppliers of goods or services to the foreign vessel, the Department of Commerce recommended that the bill be amended to provide that the preferred mortgage on a foreign vessel be subordinate to the lien of American suppliers. This amendment was adopted by the committee and appears in the bill as reported."

A foreign ship mortgage suffered such loss of priority only as a matter of remedy, that is in the event the mortgagee elected to foreclose under the Ship Mortgage Act of 1920 as amended. In a letter from Secretary of Commerce Sinclair Weeks it was observed:

"While thus providing a forum on the admiralty side of the United States courts in the enforcement of defaulted foreign mortgages, the bill does not give these foreign ship mortgages the same order of priority over subsequent repair and other liens given under existing United States laws to preferred ship mortgages on United States flag vessels. A proviso at the end of the bill provides that, in case of mortgages on foreign vessels, the mortgage lien shall be subordinated to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries. Under existing United States law, preferred mortgage liens on United States flag vessels come ahead of maritime liens for repairs, supplies, and necessaries furnished subsequent to the mortgage lien. On the other hand, the bill improves the position of the

holder of a mortgage on a foreign vessel, for under existing United States law he may only foreclose in an equity proceeding in the United States court and in such case the mortgage lien is subordinate to all maritime liens.

"The bill does not prejudice or destroy the substantive rights of an American mortgagee of a foreign-flag vessel. Such mortgagee can foreclose in a foreign court which acts independently of the Ship Mortgage Act, 1920, and secure the higher priority, if any, given the mortgage by the law of the foreign country. On the other hand, if the United States mortgagee wishes to foreclose in admiralty in the United States courts, he could do so under the bill and get the benefits of the simplified procedure not available to him under the existing law. Thus, while the bill does not give the holder of a mortgage on a foreign vessel the same preference or priorities as the holder of a mortgage on a United States vessel, it provides him an expeditious foreclosure proceeding and takes away no procedural or substantive right which he now has."

2 U.S.Code, Congressional and Administrative News, 83rd Cong., 2nd Sess., 1954, pp. 2452, 2453.

Gilmore and Black observe that, "Except for the proviso, and the list of types of vessels excluded the amendment copies Article I of the Brussels Convention of 1926 for the Unification of Certain Rules of Law Relating to Maritime Liens and Mortgages." Gilmore and Black, The Law of Admiralty, p. 578.

Augusta argues that, under the Friendship Treaty, federal courts must treat Italian nations under terms no less favorable than the terms which are accorded citizens of the United States who furnish supplies to foreign mortgaged vessels in United States ports. That appears to us a kind of "tail wagging dog" argument, and that a more reasonable contention might be that the Friendship Treaty requires the exclusion of the proviso as to Italian flag vessels—but that would not help Augusta. Be that as it may, it is clear that Augusta's contention would require this Court not simply to construe the proviso in the light of the Friendship Treaty, for the terms of the proviso are themselves so clear and unambiguous as not to admit of construction. Augusta's contention calls for this Court in effect to re-write the proviso so as to embody what Augusta conceives to be the requirements of the Friendship Treaty.

■ In an excellent opinion by Mr. Justice Burton, retired, for the Court of Appeals of the District of Columbia Circuit, the authorities are collected for the proposition " * * * that treaties and statutes are on the same level and, accordingly, that the latest action expresses the controlling law." The Justice further observes:

"Once a policy has been declared in a treaty or statute, it is the duty of the federal courts to accept as law the latest expression of policy made by the constitutionally authorized policy-making authority. If Congress adopts a policy that conflicts with the Constitution of the United States, Congress is then acting beyond its authority and the courts must declare the resulting statute to be null and void. When, however, a constitutional agency adopts a policy contrary to a trend in international law or to a treaty or prior statute, the courts must accept the latest act of that agency."

Tag v. Rogers, 1959, 105 U.S.App.D.C. 387, 267 F.2d 664, 668.

■ It follows that even if we were convinced that the proviso as applied to an Italian flag vessel contravenes the terms of the Friendship Treaty and should be re-written to accord with Augusta's contention (and we are not so convinced), nonetheless we must accept the 1954 Amendment to the Ship Mortgage Act as it is written.

In a case involving a patent statute, Judge Holtzoff answered a like objection based on this same Treaty:

"It is urged that Section 104 of the 1952 Act, if applied to Italy, violates the provisions of Article VIII of the Treaty between the United States and Italy, which became effective on July 26, 1949, 63 Stat. 2268, and which provided that nationals of either contracting party shall enjoy within the territory of the other contracting party, all rights and privileges in regard to patents on terms no less favorable than that accorded to the nationals of the other, or to nationals of any third party. If the provisions of the Act of 1952 contravene the Treaty, the former would prevail, since it is a well settled rule of law that a later enactment supersedes a prior Treaty.[5]

---

"[5] Head Money Cases (Edye v. Robertson), 112 U.S. 580, 596 et seq., 5 S.Ct. 247, 28 L.Ed. 798; Tag v. Rogers, 105 U.S.App.D.C. 387, 390, 267 F.2d 664; Ex parte Green, 2 Cir., 123 F.2d 862, 863."

Monaco v. Hoffman, Dist.Ct.D.C., 1960, 189 F.Supp. 474, 481.

On Augusta's appeal, therefore, we agree with the district court.

■ Under 46 U.S.C.A. § 953(a) (2) a lien "for wages of the crew of the vessel" is a preferred maritime lien which takes priority even though it arises after the recording and endorsement of a preferred mortgage. Relying on that provision, the Seafarer's Seachest Corporation, the International Organization of Masters, Mates and Pilots (M.M.&P.), the Seafarer's International Union (S.I.U.), the Marine Engineer's Beneficial Association (M.E.B.A.), the Radio Officer's Union (R.O.U.) and the Trustees of the Atlantic & Gulf Contract Companies libelled the T/S Denton alleging that the amounts owed to their respective pension, welfare and vacation plan funds were the equivalent of "wages of the crew of the vessel" and therefore secured by a preferred maritime lien.[3]

The liability of the employer to the funds results from its agreement with the respective unions. Each of the agreements provides that the employer has a personal obligation enforceable by a "proceeding at law, in equity, or in bankruptcy." None make reference to proceedings in admiralty. The employer's payments are made directly to trustees who have complete control of the funds. There is nothing in any of the agreements to connect any particular money paid by the employer to a particular seaman on a particular vessel. No effort was made to provide for deductions from the wages of a seaman pursuant to his written consent as is permitted by 46 U.S.C.A. § 599(g).[4] Each plan pro-

---

3. The appeal of the Seafarer's Seachest Corporation must be dismissed because it had stipulated that the preferred mortgage outranked its claim.

"COMMISSIONER ROSS: You stipulate, then, that the preferred mortgage outranks this claim?

"MR. SCHWARTZ: Yes.

"COMMISSIONER ROSS: On that statement, then, the Seafarer's Seachest Corporation is a valid and subsisting claim in the amount claimed in the pleadings, and it is inferior to the preferred mortgage and there is no formal proof that will be required on that claim unless some party should require it later on, in the event that question is material."

4. "(g) The provisions of this section shall not apply to, or render unlawful, deduc-

tions made by an employer from the wages of a seaman, pursuant to the written consent of the seaman, if (1) such deductions are paid into a trust fund established for the sole and exclusive benefit of seamen employed by such employer, and their families and dependents (or of such seamen, families, and dependents jointly with seamen employed by other employers and their families and dependents); and (2) such payments are held in trust for the purpose of providing, either from principal or income or both, for the benefit of such seamen, their families, and dependents, medical and/or hospital care, pensions on retirement or death of the seamen, life insurance, unemployment benefits, compensation for illness or injuries resulting from occupa-

vides that the payments by the employer may be used for the purpose of paying administrative costs of the operation of the plan. The plans are not set up separately for the T/S Denton, but many employers make payments to a single plan. If one employer fails to pay, his default must be made good by the other employers. A seaman receives his benefits regardless of whether his employer makes his payments to the plan.

The Commissioner takes some ten pages of the printed record to consider the terms and provisions of the various plans. For that labor to be repeated by the Court is neither necessary nor desirable. For it is clear from the provisions and features common to all of the plans, which have been sufficiently indicated, that the payments required of an employer are not "for wages of the crew of the vessel." The employer's payments of course redound to the ultimate benefit of the seamen, but they must be considered also as made for the best interests of the employer rather than as a part of the seamen's wages.

Wages of seamen occupy a unique status. The statutory provision extending them the protection of a preferred maritime lien is deeply rooted in history. Seamen's wages, "according to the favorite saying of Lord Stowell and of Mr. Justice Story, are sacred liens, and, as long as a plank of the ship remains, the sailor is entitled, against all other persons, to the proceeds as a security for his wages." The John G. Stevens, 1898, 170 U.S. 113, 119, 18 S.Ct. 544, 42 L.Ed. 969. The statutes throw around seamen's wages most definite, detailed, and stringent protections from faraway owners of vessels, from shipmasters, and from the seaman himself. See 46 U.S.C.A. §§ 541 through 646. The wages so guarded and protected are just as specifically defined; they are the amounts named in the written "shipping articles," 46 U.S.C.A. §§ 563–575, 591–601. Deductions from the wages of a seaman for

welfare, vacation or pension plans can be made only "pursuant to the written consent of the seaman" and in accordance with the other provisions of 46 U.S.C.A. § 599(g), quoted in footnote 4, supra. We agree with the district court that the employer's payments to the various funds are not "for wages of the crew of the vessel." Compare United States v. Embassy Restaurant, Inc. et al., 1959, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601. The judgment is

Affirmed.

---

tional activity, sickness, accident, and disability compensation, or any one or more of the foregoing benefits, or for the pur-

pose of purchasing insurance to provide any one or more of such benefits." 46 U.S.C.A. § 599(g).