**WARDLEY INTERNATIONAL BANK, INC., Plaintiff–Appellant,**

v.

**NASIPIT BAY VESSEL, Defendant,**

v.

**MOBIL OIL CORPORATION and Mobil Sales and Supply Corporation, Plaintiffs–Appellees.**

No. 86–6588.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1987.

Decided Feb. 11, 1988.

**260**

William H. Taron, Seider, Cohan & Taron, Los Angeles, Cal., for plaintiff-appellant.

Nicholas S. Politis, Graham & James, Long Beach, Cal., Herbert M. Lord, Alfred E. Yudes, Jr., Burlingham, Underwood & Lord, New York City, for plaintiffs-appellees.

Before SKOPIL, PREGERSON* and NELSON, Circuit Judges.

SKOPIL, Circuit Judge:

Wardley International Bank, Inc. (Wardley) appeals from the district court's judgment and order disbursing the sale proceeds of the vessel M/V NASIPIT BAY. Wardley contends that the district court's findings of fact as prepared by the prevailing party's counsel are clearly erroneous. Further, Wardley challenges the subordination of its alleged ship mortgage to the maritime liens of Mobil Oil Corporation (Mobil) and Mobil Sales and Supply Corporation (Mobil Sales) as contrary to the priority scheme set forth in 46 U.S.C. § 951 and § 953 (1982). We have jurisdiction pursuant to 28 U.S.C. § 1291 (1982), and we affirm.

## FACTS AND PROCEEDINGS BELOW

In August 1980, Maritime Company of the Philippines (MCP) purchased M/V NASIPIT BAY from Maritime Company Overseas, Inc., of Monrovia, Liberia (Overseas). The purchase price was $2,450,000 with final payment due May 31, 1983. The agreement provided for the execution of (1) a promissory note in the amount of the purchase price, (2) a preferred ship mortgage under Philippine law, and (3) an assignment of all earnings and any insurance or other compensation derived from the vessel. Additionally, the documents required the approval of Wardley, who was Overseas' financial advisor.

The buyer, MCP, did not execute the required promissory note for over one year, until September 1981. At that time MCP was current on its payments and owed a balance of $1,480,000. The note executed was not merely for the balance or the original purchase price, however, but for the much larger amount of $5,200,000. The seller, Overseas, immediately assigned the alleged mortgage to Wardley as partial security for Overseas' outstanding loans from Wardley in the amount of $13,360,-179.74. Wardley did not transfer any funds for the mortgage to either Overseas or MCP. In fact, MCP never received any funds for the note. Instead, Wardley "refinanced" Overseas' debt by consolidating Overseas' prior loans into a new loan agreement. This refinancing gave Wardley additional security interests in the form of (1) an assignment of the alleged ship mortgage and (2) MCP's guarantee of Overseas' debt.

The fact that one individual was a controlling shareholder of both MCP and Overseas may shed light on MCP's willingness to assume the additional debt without receiving any consideration. Jose P. Fernandez owned forty-five percent of MCP's shares and sixty-five percent of Overseas' shares.

In spite of the additional security given to Wardley, the parties entered into a supplemental loan agreement on February 1, 1984. They agreed to sell the vessel upon terms that were satisfactory to Wardley.

---

* Judge Pregerson was drawn to replace Judge Kennedy, who originally heard argument in this case.

Wardley would receive all proceeds from the sale. Even if the sale proceeds exceeded the $5,200,000 note, MCP as corporate guarantor was required to turn over any excess proceeds to Wardley as prepayment of Overseas' loan.

Before the decision to sell the vessel, plaintiff-appellees Mobil and Mobil Sales supplied marine lubricants, fuel, and oil to the M/V NASIPIT BAY at Hamburg, Germany and Dunkirk, France in September 1983. The maritime liens of Mobil and Mobil Sales arise from the failure of the vessel owner, MCP, to pay for these supplies.

On March 12, 1984 various parties asserting maritime lien claims against M/V NASIPIT BAY arrested the vessel in the port of Los Angeles. Wardley then commenced its foreclosure action and intervened, claiming it had priority under its alleged foreign preferred ship mortgage pursuant to 46 U.S.C. § 951 and § 953. Wardley did not notify Overseas or MCP of their alleged default until April 1984. This notice was four months after default for non-payment of interest occurred on December 15, 1983.

Wardley's accounting shows that from September 1981 to March 1984 MCP had reduced the principal on the promissory note by two million dollars. This amount fully covered the balance of $1,480,000 owed on the vessel's purchase when the mortgage was executed. Wardley alleged, however, that a $910,768 balance remained as of March 1984. Wardley's calculation resulted from splitting each payment into two separate schedules. One schedule represented the balance on the vessel's purchase. The other represented the promissory note. Thus, Wardley allocated only

part of each payment toward the vessel's purchase. Although full payment for the vessel was due May 31, 1983 under the original Memorandum of Agreement, this new payment plan provided for a final payment date of September 25, 1988, seven years after the date of the mortgage. This effectively extended Wardley's security in the vessel for five years beyond the original final payment date.

The district court declined to determine the validity of Wardley's ship mortgage. Instead, the district court ruled that even assuming Wardley had a valid mortgage, Wardley's claim was subordinated to Mobil and Mobil Sales' maritime liens. The judge requested counsel for Mobil and Mobil Sales to prepare findings of fact consistent with his comments. Wardley then filed objections to the proposed findings of fact and conclusions of law. With the exceptions of conclusion of law No. 1 and one sentence in finding of fact No. 27, the court adopted verbatim the findings of fact and conclusions of law.

## DISCUSSION

### I. FINDINGS OF FACT

■ Wardley argues that the findings of fact prepared by appellees' counsel are clearly erroneous [1] because they are irrelevant to the holding of equitable subordination and not supported by the record. Specifically, Wardley objects to findings 31, 33, 34, 35, and 36. Wardley further maintains that these submitted facts were proposed for the purpose of supporting the contention that Wardley's mortgage was invalid, which the district court declined to determine. The district court, however, considered the totality of the circumstances,

---

**1.** We will not vacate findings of fact unless they are clearly erroneous. Fed.R.Civ.P. 52(a). As long as findings are plausible in light of the record viewed in its entirety, a reviewing court may not reverse even if convinced it would have reached a different result. *Anderson v. Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This standard applies even when findings are based on documentary evidence or inferences. *Id.; see also Burlington Northern, Inc. v. Weyerhaeuser Co.,* 719 F.2d 304, 307 (9th Cir.1983). Although the parties agree that the appropriate standard of review is

clearly erroneous, Wardley urges that we "closely scrutinize" the facts because they were prepared by the prevailing party after the court had rendered its decision. The Supreme Court, however, has rejected any stricter review. *Anderson,* 470 U.S. at 571–73, 105 S.Ct. at 1510–11 ("[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous."). Even if we were to apply close scrutiny, we would nevertheless uphold the challenged findings.

including "all facets of this transaction," when it subordinated Wardley's claim. Although the findings may bear upon the validity of Wardley's mortgage, they also are important to justify a holding of equitable subordination.

■ Finding 31 states that MCP never received any money when it executed the $5,200,000 promissory note. The court further found that Wardley did not advance any money to MCP or Overseas, and yet obtained MCP's guarantee of Overseas' outstanding indebtedness to Wardley. This finding is supported by (1) the loan agreement containing MCP's guarantee of Overseas' outstanding loans and acknowledging that the "loan" equalled the already outstanding debt and was only for refinancing the prior loans; (2) the written guarantee of Overseas' liabilities by MCP; and (3) Wardley's telex of September 11, 1981, evidencing that the transaction was for the purpose of refinancing Overseas' loans. In addition, Wardley admitted there was no physical transfer of money but simply an adjusting of accounts. In light of the above evidence it is more than plausible that Wardley did not advance any money to MCP. The finding is relevant to the district court's holding because it establishes inequitable conduct. Wardley obtained a gratuitous security interest for an amount much greater than the purchase price. Its security interest potentially has priority over legitimate maritime liens. Such conduct is a fundamental element of equitable subordination. *See Custom Fuel Servs., Inc. v. Lombas Indus., Inc.,* 805 F.2d 561, 566 (5th Cir.1986).

Finding 33 provides that the supplemental loan agreement requires all proceeds from the sale of the vessel to be deposited in the name of the borrower, Overseas, and then to be paid to Wardley. Further, if the proceeds exceeded that amount due under MCP's promissory note, the excess was to be paid over to Wardley as prepayment of Overseas' debts. Each statement in this finding is set forth in Wardley's supplemental loan agreement.

Wardley contests the district court's determination in finding 34 that Jose P. Fernandez signed the supplemental loan agreement in his personal capacity. The document shows, however, that Mr. Fernandez signed the agreement three times: once for MCP, once for Overseas, and once for himself. The agreement lists Mr. Fernandez as a separate party and states that he is the "personal guarantor." The support here cannot be denied. The finding is some evidence of Overseas' control over MCP and thus bears upon the appropriateness of subordination.

Finding 35 states that Wardley had full knowledge of all the financial arrangements. Wardley knew that MCP received no consideration for its alleged mortgage, that the vessel incurred trade debts while it was encumbered by Overseas' debts, and that MCP had assigned its earnings from the vessel to Wardley. The original Memorandum of Agreement required that the note, mortgage, and assignment of the vessel's earnings be satisfactory to Wardley. Wardley is also a party to each agreement, including the loan agreement, the assignment, MCP's guarantee, and the supplemental loan agreement. This evidence is ample support of Wardley's full knowledge.

Finding 36 recognizes that MCP had paid over two million dollars in principal to Wardley, plus an unknown amount of interest between the date of the note's execution and the date of the vessel's arrest. This amount would have fully paid the outstanding balance of $1,480,000 on the purchase price. The evidence that MCP had paid two million dollars is found in Wardley's telex of April 3, 1984 stating that the remaining indebtedness on the $5,200,000 note was $3,200,000.

In sum, all of the above challenged findings are amply supported in the record. There is no evidence of exaggeration or overreaching on the part of appellees' counsel in the preparation of the proposed findings. Accordingly, the findings of fact are not clearly erroneous.

## II. THE PROPRIETY OF EQUITABLE SUBORDINATION

■ Under 46 U.S.C. § 951 and § 953 a preferred ship mortgage of a foreign ves-

sel has priority over subsequently arising liens for necessaries except that it is "subordinate to maritime liens for repairs, supplies, towage, use of drydock or marine railway, or other necessaries, performed or supplied in the United States." 46 U.S.C. § 951. Thus a foreign preferred ship mortgage generally will have priority if two requirements are met: (1) the ship mortgage is valid, and (2) the competing maritime lien was not for necessaries supplied in the United States. The district court expressly refused to determine the validity of the mortgage. Rather, it assumed the mortgage was valid.[2] The second requirement was met because Mobil and Mobil Sales supplied their fuel, oil, and lubricants, and performed their services *outside* the United States. The statute's language is plain and unambiguous. It refers only to where the supplies were delivered or services performed. *Mobil Sales and Supply Corp. v. Panamax Venus*, 804 F.2d 541, 542–43 (9th Cir.1986). Thus under the priority scheme set forth in section 951, Wardley's mortgage has priority over Mobil and Mobil Sales' maritime liens for necessaries. Nevertheless, the district court awarded priority to Mobil and Mobil Sales' maritime liens on the basis of equitable subordination.[3]

■ There is no dispute that courts, exercising admiralty jurisdiction, may apply the doctrine of equitable subordination to resolve priority disputes contrary to the statutory scheme. *E.g., Custom Fuel Servs.*, 805 F.2d at 566; *Cantieri Navali Riuniti v. M/V Skyptron*, 621 F.Supp. 171, 187 (W.D.La.1985), *aff'd on other grounds*, 802 F.2d 160 (5th Cir.1986). The only issue here is whether under the facts presented equitable subordination is appropriate. Courts have not clearly identified what set of circumstances call for subordination. Under case law developed in both admiralty

and bankruptcy, however, equitable subordination generally requires: (1) the claimant has engaged in inequitable conduct, (2) the misconduct results in injury to the competing claimants or an unfair advantage to the claimant, and (3) subordination is not inconsistent with federal law. *Custom Fuel*, 805 F.2d at 566; *see also In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977) (bankruptcy proceeding). The record must disclose findings or sufficient facts that the claimant acted wrongfully. *In re Christian Life Center*, 821 F.2d 1370, 1377 (9th Cir.1987) (bankruptcy proceeding).

■ Here sufficient facts in the record demonstrate that Wardley engaged in inequitable conduct. Wardley used its control to benefit itself at the expense of maritime lienors. First, the amount of the promissory note itself, which MCP signed, was more than three times the outstanding debt on the purchase price. Second, Wardley never advanced any consideration to MCP for the note. Wardley essentially finagled a gratuitous security interest of over three million dollars. Third, by splitting MCP's payment between the purchase price and the note, Wardley effectively extended its rights in the vessel for an additional five years. This allocation is not justified where the payor MCP never received any financial benefit. Fourth, Wardley had MCP guarantee the entire thirteen million dollar debt of Overseas. Until Overseas' loan was paid, Wardley would continue to receive the vessel's earnings while the vessel incurred maritime liens for services and supplies. By extending the mortgage, Wardley attempted to preserve its preferred status to the detriment of maritime lienors. Finally, Wardley was completely aware of the transaction. It knew of the close relationship between Overseas and MCP. This knowledge casts doubt upon the legitimacy of the mortgage. *See Se-*

---

**2.** We do not hold that Wardley's transaction is illegal or ineffective for other purposes it may serve. "Subordination does not necessarily question the legality of the transaction; rather, it merely ensures an equitable ordering of payment from the *res* before the court." *Custom Fuel*, 805 F.2d at 568; *Equilease Corp. v. M/V Samson*, 568 F.Supp. 1259, 1264 (E.D.La.1983).

**3.** The parties dispute the standard by which we review the district court's decision to subordinate Wardley's alleged ship mortgage. We need not reach this issue, however, because even under de novo review, we conclude that the district court properly invoked the doctrine of equitable subordination.

*curity Pac. Nat'l Bank v. OL.s. Pacific Pride,* 549 F.Supp. 53, 54 (W.D.Wash.1982) (part owners, joint venturers, or stockholders cannot hold liens on vessel in which they own an interest); *Equilease Corp. v. M/V Samson,* 568 F.Supp. 1259, 1264 (E.D. La.1983) (mortgage given by subsidiary to its parent was a sham), *rev'd on other grounds,* 793 F.2d 598 (5th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 570, 93 L.Ed. 2d 575 (1986); *see also Bergren v. Davis,* 287 F.Supp. 52, 54–56 (D.Conn.1968) (lack of consideration is defense to preferred ship mortgage). If one views the entire set of agreements together it is clear that Wardley used its position of control to obtain an advantage at the expense of suppliers such as Mobil and Mobil Sales.

Equitable subordination is also consistent with federal statutes. *Custom Fuel,* 805 F.2d at 568. The Ship Mortgage Act, 46 U.S.C. § 911 *et. seq.* (1982), requires the filing of an affidavit of good faith with the record of the mortgage to ensure that the mortgage is made without the purpose of avoiding the claims of creditors. 46 U.S.C. § 922(a)(3). Equitable subordination addresses the same concern of preventing injury to claimants. Second, the primary purpose of the Ship Mortgage Act to induce private capital to invest in shipping is not contravened in this case. *See Custom Fuel,* 805 F.2d at 568. Wardley did not invest any funds in the M/V NASIPIT BAY when the mortgage was created. Wardley had already invested in the form of loans to Overseas. Moreover, one of the purposes of the Maritime Liens Act, 46 U.S.C. §§ 971–975 (1982), is to create liens in favor of those who furnish necessaries for the vessel's operation. *Id.* Permitting Wardley's contrived financial scheme to prevail effectively destroys the liens of suppliers and subverts the purposes of the Maritime Liens Act.

Wardley nevertheless contends that subordination is justified only if the liens arose after default and the mortgagee knew of the default. In those instances where courts have subordinated mortgages to liens that arose only after default, the inequitable conduct did not occur until after default and thus harmed only subsequent lienors. *E.g., Gulf Oil Trading Co. v. Creole Supply,* 596 F.2d 515, 518–19 (2d Cir.1979) (to establish priority, mortgagee waited to foreclose until ship left United States' ports); *see also Cantieri,* 621 F.Supp. at 187 (mortgagee knew of default but allowed vessel to run up debts before foreclosing).

Courts have not limited the application of equitable subordination, however, to liens incurred after default. *E.g., Custom Fuel,* 805 F.2d at 567. There a parent corporation transferred a vessel to its subsidiary and took back a mortgage equal to the value of the vessel. *Id.* at 563. Because the financial transaction was a sham, the court subordinated it to other lienors on the basis of equitable subordination. Here the inequitable conduct also arose at the mortgage's creation. Subordination was appropriate even though Mobil and Mobil Sales' liens arose prior to default.

## CONCLUSION

We conclude the district court's findings of fact are not clearly erroneous. The district court properly subordinated Wardley's alleged foreign ship mortgage to Mobil and Mobil Sales' maritime liens.

AFFIRMED.