**In re Barry Rhett BRADFORD & Michelle Waller, Debtors.**

**David W. AMICK, Appellant,**

**v.**

**Barry Rhett BRADFORD & Michelle Anjeanette Waller, Appellees.**

**BAP No. ID 89–1499–AsRP.**
**Bankruptcy No. 88–03226–7.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Nov. 16, 1989.

Decided March 30, 1990.[1]

**1.** Pursuant to Bankruptcy Appellate Panel Rule 11(b)(5) this disposition is certified for publica-
tion at the request of the dissenting judge.

Fred J. Frahm, Allen R. Derr & Associates, Boise, Idaho, for appellants.

Rodney T. Buttars, Boise, Idaho, for appellees.

Before ASHLAND, RUSSELL and PERRIS, Bankruptcy Judges.

## OPINION

ASHLAND, Bankruptcy Judge:

David Amick appeals from the bankruptcy court's assessment of damages against Amick based upon the court's finding that Amick knowingly and willingly violated the automatic stay. We affirm.

## FACTS

In October, 1988 Michelle Waller worked as a subcontractor for David Amick Construction, Inc. She testified that on October 26, 1988 she met with David Amick to discuss borrowing $265 from him in order to file bankruptcy. She testified that after discussing bankruptcy, Amick told her to meet him in his office the next morning and he would write her a check. She testified that Amick tried to talk her out of filing bankruptcy for approximately 45 minutes, but that he finally gave her the check for $265. She testified that she gave him the title to her car as security for the loan. According to her testimony, she then told Amick that she needed the morning off so that she could file her petition and that he was aware that she had filed bankruptcy. At the time she received the money from Amick on October 27, 1988, Waller had already signed her bankruptcy petitions and schedules. She filed her Chapter 7 petition about 30 minutes after leaving Amick's office.

Amick on the other hand testified that in October, 1988 Waller wanted to borrow some money from him to pay bills but that he did not really want to loan her any money. He testified that she told him how much money she owed and that they discussed bankruptcy, but that he personally was against bankruptcy and advised her strongly against filing. He testified that he and Waller never entered into a loan agreement and that on October 27, 1988 he agreed instead to buy her car for $265. Although she had talked about going to the attorney with the money, he had hoped he was successful in talking her out of filing bankruptcy. He testified that she did not take time off work nor advise him that she would have to take time off work to go to court or anything like that. He testified that from the time he gave her the check for $265, she did not specifically tell him she filed bankruptcy. She just talked about the fact that she owed her attorney money and that she went to see her attorney. He testified that he did not think that he and Waller discussed bankruptcy after that.

According to Amick, he was to get the car from Waller the day after he wrote the check to her, but that when they met Waller was upset and wanted to buy the car back. He felt sorry for her so they worked out an agreement where he would loan her the $265. She was to make weekly payments of $50 to pay back the $265 plus interest. Waller denied that she went to Amick the day after she received the check

and asked him to sell back the car. She testified that the transaction was a loan from the outset.

After receiving the $265 from Amick, Waller and her husband Barry Bradford filed a petition under Chapter 7 on October 27, 1988. Amick was not listed on the schedules and did not receive notice of the filing of the petition from the clerk's office. Waller testified that she did not schedule her debt to Amick because she wanted to pay him back, and she did not want to "burn" him.

Waller made the first two $50 payments in cash and then two payments were taken directly out of her paycheck. She stopped working for Amick at the end of November, at which time she had paid him $200. She testified that when she quit Amick's company, she told the bookkeeper that she would try and get Amick paid off the following week, and if not, with her first check from her new employer. The fifth payment was not paid when it was due. Amick testified that Waller did not have a phone and that he did not contact her concerning the default. Amick repossessed Waller's 1978 Dodge Aspen on December 6, 1988.

Waller testified that after Amick repossessed the car, she went to her new employer and borrowed the remaining $65 that she owed. She called Amick and told him that she had his money and asked him if she could get her car back and he said it was too late. Amick testified that Waller called him on the night the car was repossessed and that she wanted to know if she could have the car back. He told her that there were going to be additional expenses due because of the repossession and she said that those additional costs were not her expense. He testified that he told her he would think about what he was going to do about the car but that he was not going to do anything at that time of night.

Amick testified that Waller called him twice the next day about getting her car back. Again they discussed the repossession costs and she said that the additional $125 was not her expense. He then basically told her that he did not feel there was any purpose discussing it any more. According to Amick, Waller did not mention the bankruptcy in this discussion.

Amick testified that Waller's attorney Rod Buttars first contacted him on or about December 9, 1988, and that they had a subsequent telephone conversation on December 13, 1988. Amick testified that Buttars wanted to know what Amick wanted in exchange for the car. When asked by Buttars whether Buttars had explained to Amick in the December 13, 1988 phone conversation that Waller had filed bankruptcy and that the $265 was used for the filing as originally agreed to between Amick and Waller, Amick answered that as he recalled that was not correct. He denied discussing bankruptcy in that conversation.

Amick testified that he told Buttars that he would like to think over their conversation and that Buttars was going to get back to him. He testified that Buttars did not contact him, and that after not hearing from anyone for about a month, he sold the car.

Amick sold the car for $305 on January 6, 1989. Waller filed a § 362(h) motion for contempt and for return of property of the estate on January 9, 1989. She sought a return of the car, actual damages, costs, and attorney's fees, and punitive damages of $1,000, on the grounds that Amick knowingly and willfully violated the automatic stay.

The court held a hearing on the contempt motion on February 6, 1989. After hearing the testimony of Waller, Amick, and Mr. Cross, the individual who repossessed Waller's car for Amick, the court found that under either Waller's loan theory or Amick's resale theory, the transaction was a security transaction. The court made a further finding that certainly as of December 13, 1988 Amick was aware of the bankruptcy proceedings as a result of his conversation with Buttars. The court noted that although the evidence regarding Amick's phone conversation came out only by virtue of Buttar's cross examination of Amick, that cross examination was evidence which gave the judge an inference that enabled him to make the finding. When

questioned by Amick's attorney Mr Frahm about whether Frahm should have had an opportunity to examine Buttars on that issue, the court noted that Frahm had the right to examine Buttars before Frahm rested his case. The judge noted that on the damage issue, his intent would be to make the parties whole. The matter was taken under advisement.

The judge filed findings of fact and conclusions of law on March 7, 1989. He found that Amick violated the automatic stay when he sold the car sometime after January 1, 1988. It appears that this finding contains a typographical error concerning this date. The correct date after which the car was sold is January 1, 1989. He also found that Amick knew of the filing of the bankruptcy and was held to the terms of the automatic stay as of at the very latest, December 13, 1987. Again, it appears that an error concerning this date is contained in this finding. The correct date is December 13, 1988. Due to the knowing and willful violation of the stay, the judge assessed actual damages of $838.95, the amount Waller had initially paid for the car, against Amick. In addition, the judge assessed damages of $350.00 as a reasonable attorney's fee to prosecute the contempt motion. Amick appeals from the order incorporating these findings and conclusions.

### STANDARD OF REVIEW

Factual findings by the bankruptcy court are reviewed for clear error. *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989). A finding of fact is clearly erroneous when after reviewing the evidence, we are left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948), *cited in Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *In re Contractor's Equipment Supply Co.*, 861 F.2d 241, 243 (9th Cir.1988). A bankruptcy court's award of attorney's fees will not be disturbed absent an abuse of discretion or an erroneous application of the law. *In re International Environmental Dynamics,*

*Inc.*, 718 F.2d 322, 326 (9th Cir.1983). Under the abuse of discretion standard, a reviewing court cannot reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors. *Mission Indians v. American Management & Amusement, Inc.*, 824 F.2d 710, 724 (9th Cir.1987); *In re Tong Seae (U.S.A.), Inc.*, 81 B.R. 593, 597 (9th Cir.1988).

### DISCUSSION

Amick contends that the court's factual finding that Amick knowingly and willfully violated the automatic stay was clearly erroneous. Section 362(h) provides that, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). The Ninth Circuit has adopted the following definition of willfulness under § 362(h):

A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to the property is not relevant to whether the act was "willful" or whether compensation must be awarded.

*In re Bloom*, 875 F.2d at 227 (citing *INSLAW, Inc. v. United States (In re INSLAW, Inc.)*, 83 B.R. 89, 165 (Bankr.D.D.C. 1988)).

The fact that Amick intentionally sold the car is undisputed. However Amick argues that the court's finding regarding the initial element of willfulness under § 362(h), Amick's knowledge of the automatic stay when he sold the car, was clearly erroneous. He argues that the bankruptcy court lacked evidence upon which it could make the finding as to Amick's knowledge of the bankruptcy filing.

The court did not specifically find that Amick knew of the automatic stay by virtue of the December 13, 1988 phone conversation. Instead the court found, after hearing the testimony of Waller and Amick, that Amick knew of the terms of the automatic stay as of at the very latest December 13, 1988.

■ The court's finding regarding Amick's knowledge is a finding of fact which shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 1777, 100 L.Ed.2d 249 (1988); *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Gypsum,* 333 U.S. at 395, 68 S.Ct. at 541, *cited in Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511. This standard plainly does not entitle a reviewing court to reverse the trier of fact simply because it is convinced that it would have decided the case differently. *Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511. The reviewing court oversteps the bounds of its duty if it undertakes to duplicate the role of the lower court. *Id.* In applying the clearly erroneous standard to the findings of a court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo. Id.* If the trial court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* at 573–74, 105 S.Ct. at 1511–12, *cited in Zant,* 108 S.Ct. at 1777. *See also Wardley International Bank, Inc. v. Nasipit Bay Vessel,* 841 F.2d 259, 261 n. 1 (9th Cir.1988).

■ Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511, *cited in Zant,* 108 S.Ct. at 1778. This is so even when the trial court's findings do not rest on credibility determinations, but are based on inferences from other facts. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511. The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. *Id.*

■ However when findings are based on determinations regarding the credibility of witnesses, an even greater deference to the trial court's findings is demanded. Only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. *Id.* When a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. *Id. See also Clady v. County of Los Angeles,* 770 F.2d 1421, 1431 (9th Cir.) *cert. denied* 475 U.S. 1109, 106 S.Ct. 1516, 89 L.Ed.2d 915 (1985).

■ Application of the foregoing principles to this case requires us to conclude that the court's finding that Amick knew of the filing of the bankruptcy and is held to knowledge of the terms of the automatic stay as of, at the latest, December 13, 1988 was not clearly erroneous. Initially we note that there is no admissable evidence that Amick learned of the filing on December 13, 1988. As the dissent points out, although the bankruptcy court could discredit Amick's testimony concerning the December 13, 1988 telephone conversation, it could not properly transform a question in the form of an assertion, which was denied by Amick, into evidence of the facts asserted in the question. There is, however, evidence that Amick knew of the bankruptcy filing prior to December 13, 1988. Waller testified that Amick was

aware of the bankruptcy filing, that she discussed the bankruptcy with Amick, and that she told him what she was going to do immediately before the filing. Although the testimony of Waller clearly could have been stronger and more direct, this evidence is sufficiently strong to support the bankruptcy court's finding. The bankruptcy court's apparent decision to credit this testimony, which tells a coherent and facially plausible story not contradicted by extrinsic evidence, was not clearly erroneous.

■■■■ The court could have been more precise about the grounds for its factual conclusions. However the standard for adequacy of factual findings in this circuit is whether they are explicit enough on the ultimate issues to give the appellate court a clear understanding of the basis of the decision and to enable it to determine the grounds on which the trial court reached its decision. *Louie v. United States,* 776 F.2d 819, 822–23 (9th Cir.1985). A court's failure to make express findings does not require a remand if a complete understanding of the issues may be had from the record without the aid of separate findings. *Kanarek v. Hatch,* 827 F.2d 1389, 1391 (9th Cir.1987). *See also Louie,* 776 F.2d at 823 ("Although the findings and conclusions in this case are not comprehensive, we find no need to remand for more findings because we can discern from the record the basis of the trial court's decision."); *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1445 (9th Cir. 1985) ("Although the district court's findings are lacking in particularity, we conclude that they are not so deficient as to prevent us from effectively exercising our role of review.").

■■■■ In the findings of fact and conclusions of law submitted by the court, the court did not specify whose testimony supported its finding that Amick knew of the bankruptcy as of at the very latest December 13, 1988. Similarly the court did not specify all of the evidence relied upon on its finding. However because there is sufficient evidence in the record considered in its entirety to support the court's finding regarding Amick's knowledge, we will not set that finding aside. *See Amadeo v. Zant,* 108 S.Ct. at 1780. Clearly, we may

affirm on any basis supported by the record. *Jett v. Sunderman,* 840 F.2d 1487, 1493 (9th Cir.1988); *Ford v. Manufacturer's Hanover Mortgage Co.,* 831 F.2d 1520, 1523 (9th Cir.1987).

■■■■ Amick also contends that the court's factual findings as to damages were clearly erroneous. The court awarded actual damages of $838.95, the amount Waller paid for the car in March, 1988. Amick argues that the damages should be revised to reflect the evidence he produced at the hearing as to the market value of Waller's car at the time it was repossessed. Amick argues that the market value of the car was between $250 and $300.

The court heard evidence from three different sources as to the value of the car. Waller testified that she paid $838.95 for the car in March, 1988. In addition, she testified that she and her husband had spent approximately $300 to improve the car since the time of purchase. She testified that she felt the car was worth the $1,100 that she had put into it.

Mr. Jay Miller, the manager of the company that repossessed the car, also testified as to the value of the car. He testified that his opinion was that the wholesale value of the car would be around $200 to $250 and that the car would retail for a maximum of $500. Amick testified that he initially thought he could get $500 to $600 for the car, but after contacting a few dealers, was happy to receive the $305 that he sold the car for, even though he was asking $395.

The court awarded actual damages in the amount that the debtors initially paid for the car. After reviewing the evidence, we are not left with a definite and firm conviction that the court committed a mistake in awarding $838.95 in actual damages. The actual damage finding was supported by the evidence, was not clearly erroneous and will not be reversed.

■■■■ Amick also argues that no punitive damages should have been assessed against him. The court did find that the circumstances justified the assessment of punitive damages. However the only amount assessed in addition to the actual damages of $838.95 was $350 which repre-

sented a reasonable attorney's fee for Waller's prosecution of the motion. Costs and attorneys' fees are compensable as actual damages under § 362(h). *See Bloom*, 875 F.2d at 225 n. 1. The court need not find that the circumstances justify the assessment of punitive damages in order to allow the prevailing party to recover attorneys' fees.

As noted, a bankruptcy court's award of attorneys' fees will not be disturbed absent an abuse of discretion or an erroneous application of the law. *Environmental Dynamics*, 718 F.2d at 326. Section 362(h) clearly allows an award of attorney's fees upon a finding of a willful violation of the automatic stay. The bankruptcy court correctly applied the law. In addition, the court did not abuse its discretion in awarding a $350 attorney's fee.

The court's finding that the circumstances justified the assessment of punitive damages was not necessary, since attorney's fees are compensable as actual damages. However, if such a finding were necessary, we would not conclude that the finding was clearly erroneous.

### CONCLUSION

The bankruptcy court's finding that Amick knowingly and willfully violated the automatic stay, and the court's findings regarding damages, were not clearly erroneous. The order appealed from is affirmed.

RUSSELL, Bankruptcy Judge, dissenting:

### FACTS

There are only two possible times when Amick could possibly have been notified that the debtor had *in fact* filed her bankruptcy petition. The first was on October 27, 1988, the day that she filed her Chapter 7 petition. At the trial, the debtor testified:

> Q. And after you had filed that bankruptcy had you contacted Mr. Amick and informed him that you had in fact filed the bankruptcy?
>
> A. I took that morning off to do it and then I went back to work, so he was aware.

The only other time there was testimony on this issue at the trial was during the cross-examination of Amick by the debtor's counsel, Mr. Buttars, regarding a telephone conversation between Amick and Buttars on December 13, 1988:

> Q. Okay. And isn't it true also at that time that when we discussed the original two hundred and sixty-five dollars ($265), that I had to explain to you that Ms. Waller had filed a bankruptcy and that that money was used for the filing of the bankruptcy as you originally agreed with her?
>
> A. As I recall, no. That is not correct.

During final argument, the trial court concluded:

> On the basis of the present record then we'll attempt to arrive at a conclusion which will make the parties whole. I would make further finding that I would feel *certainly as of December 13th*, the phone conversation, that Mr. [Amick] was aware of the bankruptcy proceedings as a result of his conversation with Mr. Buttars.

(Emphasis added).

Counsel for Amick objected to the court's announced findings as to what was said during the December telephone conversation and the court's response was as follows:

> MR. FRAHM: Your Honor, unless I'm misunderstanding, are you accepting as fact, by virtue of Mr. Buttars' cross examination, his assertion that at that point in time he gave Mr. Amick notice? Because Mr. Buttars has not been a witness in this matter. The only way that that testimony came out is by virtue of his cross examination.
>
> THE COURT: That's correct. Cross examination is evidence, counsel. And I'm sure you realize. And that gives an inference, I think, which will enable me to make that finding.
>
> MR. FRAHM: But then should I not have an opportunity to examine Mr. Buttars on that issue?
>
> THE COURT: Well, I assume you had that right before you rested. Okay. I'll take the matter under advisement on

that basis and let you know my decision as soon as I can. We'll be in recess.

## DISCUSSION

It is clear that the only possible evidence relied upon by the court in finding that Amick had notice of debtor's bankruptcy filing related to the testimony of Amick upon cross-examination by Buttars.

I find it surprising that the majority concludes that the trial court relied on evidence other than the December 13 telephone conversation. The majority opinion states:

> The court did not specifically find that Amick knew of the automatic stay by virtue of the December 13, 1988 phone conversation. Instead the court found, after hearing the testimony of Waller and Amick, that Amick knew of the terms of the automatic stay as of at the very latest December 13, 1988.

The majority further holds that:

> Application of the foregoing principles to this case requires us to conclude that the court's finding that Amick knew of the filing of the bankruptcy and is held to knowledge of the terms of the automatic stay as of, at the very latest, December 13, 1988 was not clearly erroneous. Initially we note that there is no admissible evidence that Amick learned of the filing on December 13, 1988. As the dissent points out, although the bankruptcy court could discredit Amick's testimony concerning the December 13, 1988 telephone conversation, it could not properly transform a question in the form of an assertion, which was denied by Amick, into evidence of the facts asserted in the question. There is, however, evidence that Amick knew of the bankruptcy filing prior to December 13, 1988. Waller testified that Amick was aware of the bankruptcy filing, that she discussed the bankruptcy with Amick, and that she told him what she was go-

ing to do immediately before the filing. Although the testimony of Waller clearly could have been stronger and more direct, this evidence is sufficiently strong to support the bankruptcy court's finding. The bankruptcy court's apparent decision to credit this testimony, which tells a coherent and facially plausible story not contradicted by extrinsic evidence, was not clearly erroneous.

The majority finally concludes:

> In the findings of fact and conclusions of law submitted by the court, the court did not specify whose testimony supported its finding that Amick knew of the bankruptcy as of at the very latest December 13, 1988.

The problem with this analysis, is that the court did not rely on Waller's testimony on this issue. This is not surprising in that, although not objected to, the testimony of the debtor that she felt that Amick knew that she had filed her bankruptcy petition, was clearly a conclusion of questionable weight. It is no wonder that the court did not rely on the conclusionary testimony of the debtor in making its decision.[2]

Although it was clearly within the trial court's discretion to totally disregard Amick's testimony concerning the December 13 telephone conversation, it could not properly transform the questions by Buttars, *denied* by Amick, into affirmative evidence.[3] Buttars was not a witness and therefore could not and did not testify.

Counsel for Amick accurately recognized the problem, that the court was considering the allegations contained in Buttar's question as affirmative evidence. Counsel complained that he did not have an opportunity to cross-examine Buttars (because Buttars was not a witness).

The court's reply that "[w]ell, I assume you had that right before you rested" confirmed the obvious error the court had made. It is obvious that only witnesses

---

**2.** Because the court did not rely on this testimony, I need not discuss whether this evidence would be sufficient to support a finding of notice to Amick.

**3.** Naturally, if Amick had *admitted* that Buttar's had told him that the debtor had filed her bank-

ruptcy case, that admission would be affirmative evidence of notice. In that case the admission incorporates the question. However, as in the present case, when the question is denied by the witness the best that. the questioner may legitimately expect is that the court will reject the answer. The court may not however, then

may be cross-examined and that the court was improperly treating Buttar's question as if Buttar had been testifying as a witness. The above quoted colloquy between Amick's counsel and the court reveals the error.

## CONCLUSION

The record is clear that the trial court did not find that Amick had notice of the debtor's bankruptcy on the day it was filed. The record is equally clear that the trial court found that Amick had notice of the bankruptcy from the debtor's attorney, Mr. Buttars, on December 13, 1988.

Because the court's finding of notice to Amick is not supported by admissible evidence, it is clearly erroneous and must be reversed. I would remand to the bankruptcy court for further proceedings consistent with this Opinion.

assume the opposite is true and turn the question into admissible evidence entirely transforming the questioning attorney into a witness.