46 F.3d 895
 1995 A.M.C. 850
 MARYLAND NATIONAL BANK, Plaintiff-Appellant,
v.
The VESSEL MADAM CHAPEL, OFFICIAL NO. 924662; a.k.a. LOIKA,
OFFICIAL NO. 942142; a.k.a. SEAQUESTER, OFFICIAL NO.
942142, her engines, masts, anchors, cables, chains,
rigging, tackle, apparel, furniture, and all the necessaries
therewith appertaining in rem, Defendants,
and
Matthew O. Jones, Claimant-Appellee.
 No. 93-55905.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 8, 1994.
Decided Jan. 25, 1995.
 
 Thomas A. Russell, Williams Woolley, Cogswell, Nakazawa & Russell, Long Beach, CA, for plaintiff-appellant.
 R. Jeffrey Kelleher, California Intern. Law Chambers, San Diego, CA, for claimant-appellee.
 Appeal from the United States District Court for the Southern District of California.
 Before: FLETCHER, THOMPSON, and RYMER, Circuit Judges.
 RYMER, Circuit Judge:
 
 
 1
 Maryland National Bank (MNB) appeals the summary judgment in favor of Matthew O. Jones, a claimant to the vessel, in MNB's admiralty action in rem against the MADAM CHAPEL to foreclose a preferred ship mortgage. In a published opinion, the district court held that MNB's preferred mortgage was equitably subordinated because its assignor failed to comply with standard good lending practices that would have avoided the problem of a state chain of title separate from the vessel's federal registration. Maryland National Bank v. The Vessel Madam Chapel, 821 F.Supp. 1361 (S.D.Cal.1993). We disagree that an extra layer of requirements having to do with a mortgagee's lending practices may be superimposed on the Ship Mortgage Act, former 46 U.S.C.App. Secs. 911-984 (recodified in 1988 as part of the Commercial Instruments and Maritime Liens Act, 46 U.S.C. Secs. 31301-31343).[1] Accordingly, we hold that MNB's preferred ship mortgage was improperly subordinated to Jones's claim to the vessel, and we reverse.
 
 
 2
 * In March of 1987, John A. Chapel purchased a new pleasure vessel, which he named the MADAM CHAPEL, with $210,000 borrowed from Key Financial Services, Inc. A Loan and Security Agreement was executed the same day, granting Key a security interest in the vessel, and providing that Chapel would apply for any certificate of title required under applicable state law, deliver it to Key, and have Key's security interest noted on it. On the date of purchase, Chapel applied for United States Coast Guard documentation for the MADAM CHAPEL at the vessel's home port in New York. He turned over the Builders Certificate as proof of title.
 
 
 3
 While his federal application was pending, Chapel obtained a Certificate of Title in July from the State of New York. The New York Certificate did not show Key's security interest.
 
 
 4
 On November 19, 1987, the Coast Guard issued a Designation of Official Number 924662 to the vessel, and on December 14, 1987, the Coast Guard issued the Certificate of Documentation. Despite Chapel's affidavit that this official number had been affixed to the vessel, it had not. Key's preferred ship mortgage was recorded with the Coast Guard in March of 1988.
 
 
 5
 On May 1, 1988, Chapel sold the vessel to Jose Santiago and conveyed title to him by endorsing the reverse side of the New York Certificate of Title. By happenstance, the following day, Key assigned its interest in the loan to MNB.[2] Neither had knowledge of the Certificate of Title or the transfer to Santiago.
 
 
 6
 In October, Chapel helped Santiago redocument the vessel with the Coast Guard under a new official number (942142) in St. Louis, without telling the Coast Guard in St. Louis that the MADAM CHAPEL had already been documented in New York. The Application for Documentation relied on the New York Certificate of Title and represented that the Builder's Certificate, which is used for Coast Guard documentation, had been lost. Later that year, while this second documentation process was pending, Jones bought the vessel. Jones knew that the vessel's name was the MADAM CHAPEL and that it was originally titled in New York, but he had no actual notice of the original official number 924662 or of MNB's preferred ship mortgage.
 
 
 7
 In September of 1989, Chapel defaulted on the loan, and MNB filed an in rem action against the MADAM CHAPEL. In September of 1991, Jones sold the vessel to Mike and Suzanne Sparkman, extending a loan to them and taking back a preferred ship mortgage which was recorded under the second official number, 942142, issued by the Coast Guard in St. Louis. On the basis of MNB's in rem action, the MADAM CHAPEL was arrested on October 16, 1992.
 
 
 8
 MNB claims a preferred mortgage interest in the vessel, as does Jones. The Sparkmans claim an ownership interest. The district court first denied MNB's motion for summary judgment, ruling there was no constructive notice of MNB's mortgage in the chain of title. Then it granted Jones's motion for summary judgment, holding that although MNB's preferred mortgage was valid, it should be equitably subordinated to Jones's interest as the bank failed to take control of the manufacturer's statement of origin, contrary to standard good lending practices, thereby making it possible for an unscrupulous owner to dupe a good faith purchaser. This timely appeal followed.
 
 II
 
 9
 MNB argues that the interests of Jones and the Sparkmans are subordinated to its mortgage by the Ship Mortgage Act because all of the requirements for preferred status under former 46 U.S.C.App. Sec. 953 were met, its mortgage was prior to the claims of Jones and the Sparkmans, and neither Jones's mortgage nor the Sparkmans' ownership interest was recorded with the Coast Guard in New York. Jones counters that MNB's mortgage was not recorded against a complete chain of title and is therefore invalid; that the recordation system broke down such that later purchasers had no actual or constructive notice of MNB's mortgage; and that, as against innocent purchasers, MNB's mortgage should be equitably subordinated because the bank left a title document in Chapel's hands sufficient to begin a second federal documentation unrelated to the first one.
 
 
 10
 * In 1920 Congress created the preferred ship mortgage, a new security device enforceable in admiralty, with priority over most maritime liens arising after perfection of the mortgage. It was intended to encourage investment in the shipping industry by providing greater security to mortgagees. See All Alaskan Seafoods, Inc. v. M/V Sea Producer, 882 F.2d 425, 428 (9th Cir.1989). Under the Ship Mortgage Act, sales and mortgages of documented vessels had to be recorded in the office of the Collector of Customs (now the Coast Guard) of the port of documentation, or home port, of the vessel. Former 46 U.S.C.App. Secs. 1011, 1012; see 46 U.S.C. Sec. 31321(a)(1). Coast Guard books are indexed to show the name of the vessel; name of the parties to the sale, conveyance or mortgage; time and date of the reception of the instrument; interest in the vessel sold, conveyed or mortgaged; and amount and date of maturity of the mortgage. Former 46 U.S.C.App. Sec. 921(b); 46 U.S.C. Sec. 31321(e). A copy of the abstract of title and any recorded mortgage is available on any documented vessel. Former 46 U.S.C.App. Sec. 927; 46 U.S.C. Sec. 31302; 46 C.F.R. Sec. 67.43-9.
 
 
 11
 To become a vessel of the United States and obtain the federal documentation required for a preferred ship mortgage, the shipowner must meet a number of federal requirements, including proof of ownership through a chain of title.[3] 46 C.F.R. Sec. 67.057(b)(3). A newly manufactured boat has two origination documents: the "manufacturer's statement of origin," which is generally used to originate a state chain of title, and the "builder's certificate," which is generally used to establish title under the federal registry system. The owner must also use diligence to keep a copy of the preferred mortgage on the vessel; to display it on request; and to refuse to permit the vessel to be operated without the official number indelibly marked on it. 46 U.S.C. Sec. 31324(b); 46 C.F.R. Sec. 67.45-17. As part of the recordation process, the owner is required to submit an affidavit of marking by which he certifies that the vessel has been marked in accordance with the regulation. 46 C.F.R. Sec. 67.15-1.
 
 
 12
 The Act protects the interests of those whose interests are properly recorded against those whose interests are not. It provides that no sale or mortgage which includes a vessel of the United States is valid against any person other than the grantor or mortgage owner and anyone with actual notice until the bill of sale or mortgage is recorded with the Coast Guard at the vessel's home port. Former 46 U.S.C.App. Sec. 1012 (recodified as 46 U.S.C. Sec. 31321(a)(1).
 
 B
 
 13
 MNB argues that because the district court correctly determined that the bank did all that was required by the Ship Mortgage Act to create a preferred mortgage on the vessel, it should not have gone on to balance the equities. Jones counters that there was a breakdown in the system on account of three failures: The bank failed to take control of the state titling process either by demanding possession of the manufacturer's statement of origin or the state Certificate of Title, or by ensuring that its lien was endorsed on the Certificate of Title; Chapel failed to affix the Coast Guard official number to the vessel, which allowed him to defeat the federal documentation process; and the bank failed to obtain a proper warrant of Chapel's good faith instead of accepting an oath by someone with Chapel's power of attorney. As a result, Jones submits, the federal documentation lacks a complete chain of title and the federal recordation is a nullity.
 
 
 14
 We agree with the district court that MNB's mortgage meets all the requirements of Sec. 922. It was endorsed on the vessel's documents by the Coast Guard; it was recorded with the Coast Guard; an affidavit of good faith accompanied the mortgage; the mortgage contains no provision for waiving its preferred status; and the bank was a citizen of the United States. As such, it was validly recorded and has preferred status. We are not persuaded by Jones's arguments to the contrary.
 
 
 15
 * Jones contends that the bank left a live state title on the loose, and for that reason, the vessel is not a vessel "documented under the laws of the United States." He claims that state law defines what constitutes legal title to a vessel, and that New York requires every vessel owner to apply for a certificate of title within thirty days after transfer. New York Vehicle and Traffic Law, Sec. 2104(a). Further, Jones says that the Security Agreement with the bank required him to obtain state titling. As a result, he contends, a complete chain of title for purposes of federal registration must include the New York Certificate of Title.
 
 
 16
 In fact, in this case, Chapel applied for federal documentation on the same day he purchased the vessel. He submitted a Bill of Sale from the seller and the Builder's Certificate to the Coast Guard along with the application for federal registration. At that time, the chain of title was complete: Chapel was the owner of the MADAM CHAPEL. All steps to secure federal registration were completed. He had no obligation to apply for state titling before then, as New York requires an application only within 30 days of purchase. Id. at Sec. 2101(n). Nor does the Ship Mortgage Act contemplate state registration as a prerequisite to federal documentation. As a "vessel of the United States," the MADAM CHAPEL was not governed by the state of New York's system for titling and recording of security interests. We agree with the Third Circuit that once a vessel has been federally documented, the validity of security interests is determined by federal law. In re Alberto, 823 F.2d 712, 716 (3d Cir.1987) (to permit state law to govern security interests in federally documented vessels would undermine congressional intent); see also Merchants National Bank of Mobile v. Ward Rig, No. 7, 634 F.2d 952, 956 (5th Cir.1981) (vessel becomes "vessel of the United States" when the completed Application for Documentation is received by the Coast Guard).
 
 2
 
 17
 Jones also argues that since the required affidavit of good faith was signed by an employee of the documentation service acting under a power of attorney instead of by Chapel, it was invalid and the mortgage not properly recorded. MNB contends that no affidavit of good faith was required under 46 U.S.C. Sec. 31322, whose effective date was January 1, 1989, but that regardless, the affidavit did not have to be personally executed under former Sec. 922(a)(3). As we hold that the affidavit requirement was satisfied by a signature under a power of attorney authorized by Chapel, we do not need to decide whether the older Ship Mortgage Act continues to control this mortgage.
 
 
 18
 We have not addressed the scope of Sec. 922(a)(3)'s affidavit requirement before, but the Tenth Circuit has.[4] In Chase Manhattan Financial Services v. McMillian, 896 F.2d 452 (10th Cir.1990), the court upheld a preferred mortgage where the affidavit was not personally signed by the mortgagor. As it explained, "[g]iven that fraud was not involved in the obtaining of the mortgage, and that [the bank] had no knowledge of bad faith on the part of [the owner], [the bank's] failure to verify independently the information given by [the owner] does not render the affidavit of good faith void under [the Ship Mortgage Act]." Id. at 460.
 
 
 19
 We agree, and hold that the affidavit signed under the owner's power of attorney suffices in this case. Section 922(a)(3) on its face does not require that all mortgagors personally sign the affidavit of good faith. At least absent any indication of complicity on the part of the lender, we see no reason to invalidate the preferred status of a ship mortgage executed by an attorney-in-fact.
 
 3
 
 20
 Jones finally argues that the certificate of marking is essential to the mortgage's preferred status. As the original official number was never marked on the vessel, Jones urges us to disregard technical compliance with the Act's requirement of a certificate and instead hold Chapel's falsification of the Certificate against the bank.
 
 
 21
 Marking a vessel permanently and conspicuously is an important part of the overall scheme of the federal recording system. An owner is required to submit a certificate of marking which states under oath that the vessel has been so marked. 46 C.F.R. Sec. 67.15-5. There is no question that the MADAM CHAPEL was not marked, and that the Certificate of Marking submitted to the Coast Guard was false.
 
 
 22
 MNB argues that the vessel was nevertheless documented when the bank's mortgage was recorded, and that the bank cannot be charged with Chapel's falsification. We agree. The marking of a vessel is not a condition for obtaining a preferred mortgage; rather, it is the filing of a certificate that is required. See Benedict on Admiralty, Sec. 68b, n. 47. As with the affidavit of good faith, there is no indication that the bank knew of any deficiency in the Certificate of Marking. Likewise, there is no indication it had any knowledge of the fact that the vessel was not marked. Cf. Matter of Meredosia Harbor & Fleeting Service, Inc., 545 F.2d 583, 588 (7th Cir.1976), cert. denied, 430 U.S. 967, 97 S.Ct. 1649, 52 L.Ed.2d 359 (1977) ("the mortgagee's bad faith will defeat a mortgagee's aspiration towards preferred status."). In sum, the Act imposes the duty of marking on the vessel's owner; the Act does not impose, and we decline to create, a requirement that a lender track down a vessel to see that it has actually been properly marked.
 
 
 23
 We therefore hold that MNB's ship mortgage has preferred status.
 
 III
 
 24
 MNB faults the district court for equitably subordinating its mortgage to Jones's on several grounds. It argues that the transfers to Jones and the Sparkmans are void as against it because they were not recorded with the Coast Guard in New York and the record of vessel documentation issued in St. Louis did not incorporate the record of vessel documentation in New York. MNB also contends that the court should not have held that both the New York and the federal chains of title are valid; instead, it should have ordered the current owner to return the St. Louis Certificate of Documentation to the Coast Guard in St. Louis so that a new Certificate could be issued under the original official number. Further, MNB asserts there is no duty on a mortgagee to control the manufacturer's statement of origin or the state titling process, as the district court held. MNB also contends that the court erred in concluding that Jones lacked constructive notice of its mortgage. Finally, MNB urges that equitable subordination is inappropriate because neither Key nor MNB engaged in any inequitable conduct; MNB shouldn't be stuck with any dereliction of duty by its assignor of which it lacked knowledge; and subordination under these circumstances is inconsistent with the Ship Mortgage Act.
 
 
 25
 Jones's basic position is that someone has to bear the loss; that the bank let Chapel have the means of manipulation by not keeping control of the state titling process, contrary to good lending practices; and that as between an innocent purchaser and the bank, the bank should stand behind the innocent purchaser as the district court found. He argues that equitable subordination is appropriate where the bank has shown extreme or irresponsible indifference to the interests of subsequent purchasers and lienors.
 
 
 26
 We have recognized that equitable subordination is available in admiralty to resolve priority disputes. Wardley International Bank v. Nasipit Bay Vessel, 841 F.2d 259, 263 (9th Cir.1988). In Wardley, we held that "equitable subordination generally requires: (1) the claimant has engaged in inequitable conduct, (2) the misconduct results in injury to the competing claimants or an unfair advantage to the claimant, and (3) subordination is not inconsistent with federal law." Id. (citing Custom Fuel Servs., Inc. v. Lombas Indus., Inc., 805 F.2d 561, 566 (5th Cir.1986). As we do not believe that the bank engaged in inequitable conduct under the first prong of the Wardley test, regardless of whether it complied with standard good lending practices, we conclude that MNB's preferred ship mortgage should not have been equitably subordinated to Jones's.[5]
 
 
 27
 Inequitable conduct sufficient to support equitable subordination cannot be based on mere negligence, as the district court held, or indifference, as Jones suggests. In both Custom Fuel and Wardley, unlike in this case, the mortgage in question was effectively a sham. Custom Fuel, 805 F.2d at 562-63 ("We decline to give effect to this sham...."); Wardley, 841 F.2d at 263 ("Wardley essentially finagled a gratuitous security interest of over three million dollars."). Indeed, Custom Fuel identified three indicia of inequitable conduct, all more culpable than negligence, none of which is present here: "(1) fraud, illegality, breach of fiduciary duties; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego." Custom Fuel, 805 F.2d at 566.
 
 
 28
 Jones urges us to follow McCorkle v. First Pennsylvania Banking and Trust Co., 459 F.2d 243, 251 n. 9 (4th Cir.1972), where the Fourth Circuit said that "[w]here both parties are innocent of wrongdoing and one had it in his power to prevent the fraud while the other did not, the latter has the higher equity." Because the McCorkle action was dismissed for lack of jurisdiction, the statement upon which Jones relies is dicta and therefore not persuasive. In any event, balancing equities before determining whether the lender has engaged in inequitable conduct is inconsistent with the approach we adopted in Wardley, 841 F.2d at 263. There, we relied on facts which demonstrated that the mortgagee had engaged in inequitable conduct in order to obtain a gratuitous security interest: (1) the promissory note was more than three times the outstanding debt on the purchase price; (2) the mortgagee never advanced consideration to the vessel owner on the note; (3) the mortgagee unjustifiably extended its rights in the vessel for an additional five years by splitting the purchaser's payment between the mortgage for the purchase price and the note; (4) the mortgagee had the buyer guarantee a substantial debt of the seller, with the effect that it received the vessel's earnings while the vessel incurred maritime liens for services and supplies; and finally, (5) the mortgagee was "completely aware" of the transaction, which cast doubt on the legitimacy of the mortgage. Nothing similar is present here: The bank gave full value to the owner of the boat for its interest and was unaware of the events culminating in the issuance of a second federal registration. We decline to extend Wardley to the bank's conduct here; even if Key were negligent (which we assume, but do not decide), negligence does not suffice.
 
 
 29
 Therefore the bank's failure to control the state titling process, even though that may have started a chain of unfortunate circumstances from Jones's point of view, is not inequitable conduct of the sort required to subordinate a preferred mortgage. As MNB's ship mortgage has preferred status, the district court should have ordered that its interest has priority.
 
 
 30
 REVERSED and REMANDED.
 
 
 
 [1]
 For purposes of this appeal, the principal difference between the two enactments is the former Ship Mortgage Act's requirement that the mortgage be accompanied by an affidavit of good faith. 46 U.S.C.App. Sec. 922
 
 
 [2]
 As it is unnecessary to our holding, we do not determine the extent to which MNB may be held responsible for the conduct of Key and instead generally treat MNB and Key as a single entity, sometimes referred to as "the bank."
 
 
 [3]
 Section 922(a) of the Old Act provides that preferred status is given if
 (1) The mortgage is endorsed upon the vessel's documents in accordance with the provisions of this section;
 (2) The mortgage is recorded as provided in section 921 of this title, together with the time and date when the mortgage is so endorsed;
 (3) An affidavit is filed with the record of such mortgage to the effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;
 (4) The mortgage does not stipulate that the mortgagee waives the preferred status thereof; and
 (5) The mortgagee is a citizen of the United States ...
 
 
 [4]
 Two district courts which have considered whether the owner must personally sign the affidavit of good faith have reached opposite results. In Bank of Astoria v. M/V Pacific Conquest, 1986 A.M.C. 2182, 2183 (D.Or.1986), the court held that because of a concern about affidavits by truthful agents who may be "dupe[s] of cunning and fraud," the Ship Mortgage Act should be construed to require all mortgagors personally to execute affidavits of good faith to accompany the mortgage. But see Port of Portland v. M/V Paralla, 1987 A.M.C. 2478, 1987 WL 34271 (D.Or.1987) (personal execution requirement satisfied when the affidavit was signed under power of attorney authorized by corporate resolution). The court in Chancery National Bank v. Blue Eagle, 697 F.Supp. 1160, 1161 (W.D.Wash.1988), rejected Astoria, noting that no such requirement appears on the face of the statute and that, in the absence of alleged fraud, no purpose would be served by invalidating preferred mortgages. We find Blue Eagle 's reasoning more persuasive
 
 
 [5]
 We therefore reach no other arguments made by either party