**MARYLAND NATIONAL BANK, Plaintiff,**

v.

**THE VESSEL MADAM CHAPEL, Official Number 924662, aka Seaquester, Official Number 942142, her engines, masts, anchors, cables, chains, rigging, tackle, apparel, furniture, and all the necessaries therewith appertaining in rem, Defendant;**

**Mike L. and Suzanne SPARKMAN, Cross–Claimant,**

v.

**Matthew O. JONES, Cross–Defendant.**

**Civ. No. 92–1594–G (BTM).**

United States District Court, S.D. California.

May 19, 1993.

Thomas A. Russell, Williams, Woolley, Cogswell, Nakazawa & Russell, Long Beach, CA, for plaintiff.

R. Jeffrey Kelleher, San Diego, CA, for claimant Jones.

William E. Dysart, Dysart & Dubick, San Diego, CA, for cross-claimant.

---

### MEMORANDUM DECISION AND ORDER

GILLIAM, District Judge.

On April 19, 1993, claimant Matthew O. Jones' motion for summary judgment came on for hearing before this court, the Honorable Earl B. Gilliam presiding. R. Jeffrey Kelleher appeared for claimant Jones; Thomas A. Russell appeared for plaintiff Maryland National Bank.

At the conclusion of the hearing, the court took claimant's motion under submission. After considering all of the pleadings, memoranda of points and authorities and other documents on file herein, and after having heard and considered oral argument, the court now grants claimant's motion for summary judgment. Due to its negligent conduct in failing to either retain control of the vessel's title origination documents or endorse its lien on the state certificate of title, the bank's interest in the vessel shall be equitably subordinated to claimant's interests.

### BACKGROUND

*Factual background.*

On March 31, 1987, John A. Chapel became the original purchaser of the pleasure vessel which is the subject of this lawsuit.[1] A Loan and Security Agreement was executed the same day, extending credit to Chapel and creating a security interest in the vessel in the amount of $210,000.[2] The bank's mortgage was not recorded until March 10, 1988. Shortly after the sale, Chapel applied for official United States Coast Guard documentation on the vessel. Owing to an administrative backlog, however, the Coast Guard did not finally issue an official number to the vessel until November 19, 1987. On that date, the Coast Guard issued a certificate of documentation, and the vessel was given official number 924662. Upon issuance of the certificate of documentation, the boat became

1. Mr. Chapel has evidently disappeared, and cannot be located to be made a party to the action.

2. The original lender was Key Financial Services, Inc., which in May 1988 assigned its interest to Maryland National Bank ("MNB"), plaintiff in this case. That assignment is not at issue here, and both Key and MNB are hereafter referred to as the "bank".

a "vessel of the United States." 46 U.S.C.App. § 808; 46 C.F.R. § 67.01–1.

Meanwhile, in July 1987[3] Chapel acquired a certificate of title from the New York State Department of Motor Vehicles. State titling was required by the terms of Chapel's Loan and Security Agreement with the bank, and was possibly required by New York law as well. Significantly, New York issued a "clean" certificate of title, which did not show the bank's lien against the boat. At this point, two chains of title to the boat were in existence: one federal, by the Coast Guard; the other state, through the New York certificate of title. Such dual titling is not in itself unusual. The important fact is that the second, state document of title did not evidence on its face an already existing mortgage.

On May 1, 1988, Chapel sold the boat to a Jose Santiago. On October 4, 1988, Chapel assisted Santiago in obtaining from the Coast Guard a second official number, No. 942142, based upon the New York certificate of title which showed no lienholders. Later in October 1988, the boat was subsequently resold, in the New York line of title, to Matthew Jones, the claimant in this action. In September 1991, Jones sold the boat to Mike and Suzanne Sparkman of San Diego, extending a loan and taking back a preferred ship mortgage in return.

Since Chapel had been in default on his original promissory note since September 1989, the plaintiff bank filed an *in rem* action against the vessel to foreclose the mortgage. The boat has been under arrest since October 16, 1992. At an April 5, 1993, hearing, this court denied plaintiff's summary judgment request, ruling that there was no constructive notice of plaintiff's mortgage in the federal title chain and that claimants could thus not have had constructive knowledge of plaintiff's interest in the vessel.

*The maritime recordation and titling system.*

When a boat is manufactured, two different origination documents are issued. The first is called the "manufacturer's statement of origin" ("MSO"), and is used to originate a state chain of title. That chain is established by producing bills of sale linking each subsequent purchaser to his predecessor, ultimately back to the manufacturer. This was the chain of title under which Jones and the Sparkmans bought the vessel. The second origination document is the "builder's certificate," which is used to establish the first owner's title for boats that are not issued state certificates of title. It is placed on file with the Coast Guard. The bank's mortgage appears in this alternate chain of title tracing back to the vessel's builder's certificate. Two types of origination documents are necessary because vessels can be (but need not be) registered under two different registries, one state and one federal. Both registries require original proof of ownership, hence the two types of origination documents.

Both the MSO and the builder's certificate are potentially documents of title, "live" documents from which a chain of title can emanate. These basic facts are well known to those who regularly deal in marine sales and financing. The core problem animating this litigation is not that there exist two chains of title to the boat. Rather, it is that the two chains of title do not both evidence the bank's lien. Jones and the Sparkmans were bona fide purchasers for value of the boat in the New York title chain, the one which did not show the bank's mortgage. They therefore purchased the vessel without notice of the bank's interest. One reason they did not have notice is the fact that the original official number issued to the boat (No. 924662) was not conspicuously and indelibly marked in large block letters on a structural member of the boat, as required 46 C.F.R. § 67.15–1.

*The federal registry and the Ship Mortgage Act of 1920.*[4]

There is no federal common law or statute creating or determining property interests in

---

3. That is, approximately four months after the loan was made and four months before the Coast Guard issued Official No. 924662 to the boat.

4. The Ship Mortgage Act of 1920 governs in this case. It is codified at 46 U.S.C.App. §§ 911–984.

The Act was repealed in 1989, but is nevertheless the applicable law in this case because the security interests in the vessel were created prior to that time. The revised provisions were codified at 46 U.S.C. §§ 12101–31343.

boats. Rather, federal law creates a nationwide system of recordation which pleasure-boat owners and lenders may avail themselves of if they wish. The boats thereby become "vessels of the United States." The system documents state-created titles and mortgages. When properly done, the effect of documentation is to confer "preferred" status on recorded mortgages. Under federal maritime law, those mortgages may then be enforced *in rem* against the boat (as a vessel of the United States), in preference over the claims of most subsequent claimants.

The basic idea underlying the system is provision of notice to the world of a mortgage's existence. *In re Alberto*, 823 F.2d 712, 720 (3rd Cir.1987). In principle, a purchaser can search the federal registry and determine whether a preferred mortgage exists. A mortgage cannot enjoy preferred status unless it is duly recorded under this system. There is, however, no compulsion to record. Pleasure vessels can be, and often are, federally undocumented.

The security afforded to subsequent purchasers and lienors rests on two basic features of the federal system. First, the coast guard assigns an official number to each federally-documented boat. By law each boat may have only one federal number. The number "must be marked by any permanent method which cannot be obliterated or obscured, in block-type Arabic numerals not less than three (3) inches in height on some clearly visible interior structural part of the hull." 46 C.F.R. § 67.15–1. Before the number may be issued, the owner must swear in a "certificate of marking" that this regulation has been complied with. This physical security is at the heart of the system: It ensures against the creation of two or more chains of *federal* documentation. It also reassures subsequent purchasers and lienors that a physical inspection of the boat will reveal its documentation status.

The second feature of the system is recordation of the mortgage in the Coast Guard registry, under the official number. This recordation is also crucial to the system: It ensures that undocumented vessels have only a single chain of title, that the sole chain of title is reflected in the federal registry under a unique official number, and that a vessel may be readily located in the listing by its given number.

In summary, an official number (No. 924662) was assigned on November 19, 1987, to the vessel based on the federal documentation emanating from the builder's certificate. That number was, however, never indelibly marked on the vessel. There was thus no physical indication of an official federal registration. Meanwhile, in July 1987 Chapel obtained a New York certificate of title, as required by his Loan and Security Agreement with the bank. Somehow that title chain failed to reflect the bank's lien on the boat. The absence of a physical marking of the first official number on the boat made it possible for the second official number (No. 942142) to be issued on October 4, 1988, based on the New York title. The New York chain of title emanated from the MSO and provided purchasers no notice of the Bank's mortgage.

## DISCUSSION

### CLAIMANT JONES' MOTION

Claimant Jones suggests that three "breakdowns" occurred which defeated the intent and smooth working of the federal recordation system in this case: First, the bank failed to take control of the state titling process, thereby permitting Chapel to evade the federal documentation regime. Claimant suggests the bank should have demanded possession of the MSO or ensured that its lien was endorsed on the New York certificate of title. Second, the first Coast Guard official number was never affixed to the vessel, likewise allowing Chapel to evade the federal documentation process. Third, the bank failed to obtain a proper warrant of Chapel's good faith. Chapel never took such an oath, but purported to allow his attorney-in-fact (an employee of the documentation service) swear on his behalf.

Claimant initially argues that foreclosure should be denied because the bank's mortgage was never recorded against the New York chain of title as required in the Ship Mortgage Act. The vessel was initially pur-

chased and homeported in New York. That state's Vehicle and Traffic Law (§§ 2101, 2104), which applies to boats as well as cars, requires a new owner to apply for a certificate of title within 30 days of transfer of the vehicle. The bank, for its part, disclaims any knowledge or notice of Chapel's New York titling, and characterizes it as "fraudulent." Yet, claimant urges, it was more than foreseeable to the bank. State titling was not only allowed, but required, both by New York law and the terms of the March 31, 1987, Loan and Security Agreement which provided:

> Borrower agrees promptly to apply for, obtain, and deliver to Creditor any certificate of title on the vessel as required under applicable state law and to have Creditor's security interest noted on any such certificate of title.

Thus both by law and by express agreement of the parties, the New York certificate of title was the operative title. By any rational definition, a "complete" chain of title, as required by the federal regulations, must include the New York certificate of title.

The New York statute does contain an exclusion for a "vessel having a valid marine document issued by the United States. . . ." § 2102. The boat in question, however, was not even issued a putative federal document until eight and a half months after the initial purchase. Thus, claimant argues, the bank allowed a live state title to remain on the loose, thereby frustrating the smooth operation of the federal documentation system. In sum, a vessel whose documentation lacks a complete chain of title, in contravention of 46 C.F.R. § 65.05–7, is not a vessel "documented under the laws of the United States."

Claimant Jones then argues that the bank's failure to take up or endorse the state certificate of title merits the equitable subordination of its interests to those of innocent purchasers who in good faith relied on that title. Claimant further suggests that, even if the court finds that the bank's mortgage is not simply a nullity for not having been properly recorded, the fact remains that the bank's failure to take custody or control of the state title constitutes a serious departure from standard good-banking practices. It

therefore qualifies as "inequitable conduct", requiring the bank's mortgage to be subordinated to the mortgage and ownership interests of Mr. Jones and the Sparkmans under the doctrine of equitable subordination.

■ The elements of equitable subordination are as follows: 1) the bank engaged in inequitable conduct; 2) the misconduct results in injury to competing claimants to the vessel; 3) subordination is not inconsistent with federal law. *Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel,* 841 F.2d 259, 263 (9th Cir.1988). The bank must certainly have known, as do all marine lenders, that a "loose" certificate of title can be used to resell the boat free of a mortgage. The bank's failure to take control of the certificate of title was "a serious departure" from usual practices on the part of lenders. (Affidavit of Janet K. Saxton, ¶ 8, appended to claimant's Opposition.) It therefore constituted gross negligence, and a negligent indifference to the rights of subsequent purchasers. In claimant's view, the bank itself confirms the seriousness of this error, saying "it would not be their practice to allow him to put a title on the boat without listing them as a lienholder" and "it's not common business practice to allow someone to get a title to a boat without your lien being recorded on it." (Sledzianowski deposition, p. 67, lines 12–15; p. 75, line 2.)

In support of his equitable subordination argument, claimant relies on *McCorkle v. First Penn. Banking and Trust Co.,* 459 F.2d 243 (4th Cir.1972). In that case, the bank perfected a security interest in a boat under state law. The debtor later used the builder's certificate to federally document the vessel, concealing the bank's security interest. An innocent purchaser, relying on the lien-free abstract of title, bought the vessel. The district court granted summary judgment in favor of the innocent purchaser. The Court of Appeals was compelled to dismiss the action for lack of subject matter jurisdiction but left no doubt that, on the merits, summary judgment for the innocent party was proper. The court stated:

> Where both parties are innocent of wrongdoing and one had it in its power to prevent the fraud while the other did not, the

**1366**

latter has the higher equity. (At 251, fn. 9.)

By the same reasoning, claimant urges that the mortgage of the bank here should be subordinated.

Claimant further argues that strict compliance with the Ship Mortgage Act is required where failure to follow all prescribed provisions is prejudicial to innocent parties. The definitive case on substantial compliance is *In re Alberto*, 823 F.2d 712 (3rd Cir.1987). The court there emphasized that "notice of pre-existing liens to prospective creditors is the purpose of the Ship Mortgage Act's recording requirements" (at 720). Substantial compliance is achieved "if prospective creditors could learn of the pre-existing mortgage lien with reasonable effort" (at 719). Here, no reasonable effort could have uncovered the bank's mortgage. The act "should be strictly construed so far as the protection of creditors and lienors from fraud and like acts is concerned...." *Id.*

## PLAINTIFF'S OPPOSITION

In opposition, plaintiff urges that claimant Jones cannot show the state chain of title arose through the bank's fault. Jones, it argues, has failed to prove that the bank failed to retain possession of the MSO, or that Chapel ever documented the vessel in New York using the MSO.

Plaintiff insists that whether the boat was actually marked with the number is irrelevant to its mortgage's validity. The Ship Mortgage Act does not require marking of the vessel, nor is marking a condition for the mortgage's validity or priority. Since actual notice is not required, the lack of marking cannot jeopardize the bank's mortgage. *Brandon v. S.S. Denton*, 302 F.2d 404, 407–8 (5th Cir.1962).

In reply to claimant's arguments, plaintiff asserts that state registration statutes are preempted insofar as they purport to cover vessels which are documented under federal law. *In re Alberto*. The boat in question became a "vessel of the United States" on

December 14, 1987, because the Coast Guard certificate of documentation was issued on that date. Thus, on that same date, the federal documentation preempted the July 1987 New York title to the boat. Once the vessel became federally documented, the New York registration was no longer valid for the purpose of giving notice.

Plaintiff further argues that the boat remained a "vessel of the United States" despite any fraud on the part of Chapel. *Allen v. United States*, 66 F.2d 899 (9th Cir.1933). Similarly, any falsification of the certificate of marking is also immaterial. The regulation requires only that evidence of marking be provided; whether the certificate was signed or not is irrelevant, plaintiff suggests. 46 C.F.R. §§ 67.15–7 and 67.15–9.

Additionally, plaintiff argues that the doctrine of equitable subordination does not apply to the facts at bar. Plaintiff relies on a Fifth Circuit definition of inequitable conduct requiring: 1) fraud, illegality or breach of fiduciary duty, 2) undercapitalization by the mortgagee, or 3) use of the debtor as a mere instrumentality or alter ego. *Custom Fuel v. Lombas Industries*, 805 F.2d 561, 566 (5th Cir.1986).

The bank further argues that it has an equity higher than do the claimants. The bank points out that it took steps to give public notice of its interest in the boat, while the claimants failed to fully investigate its federal registration. Since the bank filed a UCC–1 Financing Statement on April 20, 1987, its security interest was properly perfected at that point.[5] Thus the bank did take steps to give notice of its interest beyond recording its mortgage with the Coast Guard. Moreover, plaintiff suggests, Jones' documentation service failed to investigate whether any liens had been filed against the vessel while it was registered in New York. If it had, the bank's UCC–1 form would have been found. Similarly, plaintiff urges that Jones' documentation services should have known that the state chain of title was suspect. This is because the builder's certificate was missing (since the Coast Guard had it),

---

**5.** In reply, claimant argues that the New York Vehicle and Traffic Law, §§ 2118 and 2123, completely excludes and removes boats from the UCC filing scheme. Boats, like cars and trucks, have their own titling regime. Thus, according to claimant, the fact of UCC filing by the bank is irrelevant.

and a waiver was requested stating it was "lost." Jones should have found the builder's certificate since he should have known it could have been used to originate a federal chain of title.

ANALYSIS

A summary judgment motion is proper in this case as there is no genuine issue of material fact, and both parties have supplemented their initial pleadings with declarations and affidavits. Fed.R.Civ.Proc. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ That the bank holds a valid preferred ship mortgage against the vessel under Official No. 924662 is beyond dispute. Moreover, the fact that the official number was never marked is legally irrelevant to that mortgage's validity. Rather, marking goes to actual notice of a mortgage's recordation. Since actual notice is not required, the lack of marking does not jeopardize the bank's mortgage. *Brandon.* Instead, actual notice becomes a factor to consider in balancing the equities of this case, given that claimant Jones had no *constructive* notice of the bank's interest in the boat.[6] Because both chains of title are legally valid, this court is compelled to invoke equitable principles to resolve the dispute.

■ It is decisively significant that a second Coast Guard official number (No. 942142) was issued to the vessel. This second number is incorporated in the New York chain of title. That title does not evidence the bank's lien against the boat. The New York titling documents, in combination with the second federal official number, thus appear on their face to constitute a complete chain of title. From these documents, there is no indication that further inquiry would be necessary to determine whether additional titling documents or encumbrances exist. These facts made it extremely improbable that Jones or the Sparkmans would ever discover the bank's lien during a routine title search.[7] As far as the claimants knew, or could reasonably be expected to have known, the vessel had an official number, and that number was 942142. There was nothing to indicate that an earlier "lost" number bearing a lien might be in existence.[8] The bank is entitled to a remedy from the primary malefactor, Chapel. It may not, however, under the circumstances of this case, look to the claimants, innocent bona fide purchasers for value, for satisfaction.

The relative equities of the parties must therefore be examined to resolve this suit. It has been established that Chapel was obliged to obtain a state certificate of title. This was explicitly required by the Loan and Security Agreement, and arguably required by New York law as well. The bank, then, knew that Chapel would begin a state line of title. In contravention of standard good-lending practices, the bank failed to either retain possession of the MSO or to ensure that its mortgage was endorsed on the state title. Had the bank done either of these two things, Jones and the Chapmans, all good faith purchasers for value without notice, would not have lost the vessel to a maritime arrest or been subject to this litigation.

6. Such was the rationale of this court's April 4, 1993 ruling denying plaintiff's motion for summary judgment. Had Official No. 924662 been affixed to the vessel, the claimants would have had actual notice of that chain of title and thus of the bank's mortgage. This court's inquiry would have ended there, and no equitable analysis been necessary.

7. In fact claimant, in his papers, asserts that three different documentation services were employed to search Jones' title and none of them was able to turn up any evidence of the bank's mortgage.

8. While it is true that the bank located the vessel, then in the Sparkmans' possession, through a Coast Guard records search, claimant Jones suggests that the investigation took three years to come to fruition. When accomplished through a locator number, reasonable public records searches naturally require far less time than three years to yield results.

The court is unpersuaded that, simply because plaintiff was able to locate the boat by assiduously sifting through Coast Guard official number lists, claimants should now be held to have undertaken a similarly onerous and time-consuming inquiry. *In re Alberto,* at 719. While the bank's diligence is noteworthy, specific public records which cannot be found by the usual, reasonable means should not be presumed to give constructive notice of their own existence.

**1368**

The bank's negligent actions in 1987 constitute inequitable conduct. That conduct has prejudiced Jones and the Sparkmans. The bank's conduct in 1987 certainly calls into question its equitable claim to the vessel in this litigation. Accordingly, the bank's interest in the vessel shall be equitably subordinated to the interests of the claimants. *See Wardley Int'l Bank, Inc. v. Nasipit Bay Vessel,* 841 F.2d 259 (9th Cir.1988).

The bank was in the best position to avoid this law suit, simply by behaving as a fully responsible lender. Had the bank done so, the entire expense of this litigation to the claimants would have been avoided. As the *McCorkle* court stated:

> Where both parties are innocent of wrongdoing and one had it in its power to prevent the fraud while the other did not, the latter has the higher equity. (At 251, fn. 9.)

### CONCLUSION

For the above stated reasons,

IT IS HEREBY ORDERED that claimant Matthew O. Jones' motion for summary judgment against plaintiff Maryland National Bank is granted.

IT IS SO ORDERED.