UNITED STATES of America, Plaintiff,

Fairway Terminal Corporation, for itself and on behalf of I.T.O. Corporation, and Tomen America, Inc., Intervenor–Plaintiffs,

v.

THE PRIDE OF TEXAS, her engines, tackle, appurtenances, etc., in rem, Seahawk Management, Inc., in personam, Hull 751–IRFC I Partnership, in personam, Defendants.

Civil Action No. 2:92cv211.

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 5, 1994.

Samuel Johnson Webster, Daniel Reid Warman, Williams, Kelly & Greer, Norfolk, VA, for Fairway Terminal Corp., Tomen America, Inc.

JACKSON, District Judge.

## MEMORANDUM OPINION AND ORDER INTRODUCTION

This is an admiralty case in which there are three motions before the court. First, the United States seeks an order compelling the intervenors to provide complete responses to its interrogatories. Second, the United States seeks a default judgment by the court against the Pride of Texas, and any party who has not already intervened in this case. The final motion before the court involves a determination of which party has a priority claim to the foreclosure proceeds from the sale of the Pride of Texas. The United States has moved for summary judgment, stating that since it has a preferred mortgage lien on the vessel, its claim is superior to all others. Fairway Terminal Corporation and Tomen America, Incorporated ("intervenors"), claim that despite the United States' preferred mortgage, their claims should take priority under the principle of equitable subordination.

Upon review of the record, and for the reasons that follow, the court grants the United States' motion for a default judgment against the Pride of Texas and any claimants not already a party in this case. In addition, the court grants the United States' motion for summary judgment. The court will not address the government's motion to compel discovery since granting the motion for summary judgment moots the discovery issue.

## I. FACTS [1]

The Pride of Texas was owned by Hull 751–IRFC I Partnership ("Hull–IRFC"). Hull–IRFC was part of a conglomerate called the Falcon Group ("Falcon"). Falcon owned 11 ships, some of whose financing was cross-guaranteed. The entire group shared a common board of directors and a chief operating officer.

In May of 1981, the United States, through the Maritime Administration ("MARAD"), insured the repayment of U.S. Government Guaranteed Ship Financing Bonds, totalling approximately $17 million, under its Title XI financing program. This was done in order to finance the construction of the Pride of Texas. Hull–IRFC entered into a mortgage agreement with MARAD which served as collateral and secured the right of the United States to foreclose on the vessel. The mortgage was promptly recorded in the proper Coast Guard office. Between December 19, 1986 and July 14, 1988 the shipowner executed five supplements to the mortgage, primarily in order to allow it to withdraw money from its Title XI Reserve Fund. MARAD requires that a shipowner who does not meet certain financial criteria to maintain a reserve fund for each Title XI agreement. When the shipowner realizes profits over a certain amount, part of those profits are deposited in the reserve fund. This fund ensures that money will be available to meet loan payments or other operating expenses when financial difficulties arise. These supplements were also promptly recorded with the proper Coast Guard office.

In May of 1992, Hull–IRFC was unable to make its payments and defaulted on the mortgage. The United States Secretary of Transportation, who represented the government in this matter, subsequently paid almost $15 million to satisfy the ship's construction bonds. As of July 31, 1992, Hull–IRFC owed the United States a total of $15,045,779.67, including insurance costs and interest. On September 25, 1992, the United States filed this action against the Pride of

---

1. When determining a motion for summary judgment, "any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion." *Teamsters Joint Council No. 83 v. Cen-Tra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991).

Texas, *in rem*, and Hull–IRFC, *in personam*, in order to foreclose on the mortgage and recover the money due the government. The vessel was arrested on October 8, 1992 and sold to MARAD on January 8, 1993, for two million dollars. The vessel is currently docked at Fort Eustis, Virginia. The proceeds of the sale are being held in an government account.[2]

Meanwhile, on November 12, 1992, Fairway Terminal Corporation of Houston, Texas, filed a motion to intervene. Fairway claims a lien against the Pride of Texas for loading and other services totalling approximately $180,000 rendered between September 23 and October 8, 1991. Tomen America, Incorporated, of New York City, filed an intervening complaint on January 14, 1993, claiming a lien against the Pride of Texas for fuel services totalling just under $50,000. These services were rendered on February 26, 1992. No other parties intervened in this case and on March 31, 1993 the court clerk entered a default against the vessel, its owners, and any additional claimants, following a motion by the United States. At the same time, the United States made a motion for summary judgment pursuant to Rule 56 against Fairway and Tomen claiming that its lien on the vessel took priority over their liens.[3]

## II. DISCUSSION

**A. The court will grant the United States' motion to enter a default judgment against the Pride of Texas and any claimants who are not a party to this case because the vessel was properly arrested, notice of the arrest was published, and no other parties filed a timely claim.**

■ The clerk has already entered a default against the Pride of Texas and any persons not already a party to this action under Federal Rule of Civil Procedure 55(a). The United States now seeks a judgment of default by the court under Rule 55(b)(2). In seeking the default judgment against the Pride of Texas and any other potential parties, the government has complied with Supplemental Admiralty Rules C(3) (relating to judicial authorization for an arrest of a vessel) and C(4) (relating to notice of the arrest). The Pride of Texas has been arrested and, therefore, the court has jurisdiction over the vessel enabling it to enter a default judgment. *See Wong Shing v. M/V Mardina Trader*, 564 F.2d 1183, 1186 (5th Cir.1977) (stating that "arrest or seizure of . . . property [*in rem*] gives the court jurisdiction"). Except for the intervenors, no other party has complied with the requirements of Supplemental Admiralty Rule C(6) to file a claim and answer to the arrest; therefore, the court can properly hold the vessel in default and bar any future claims to the vessel's proceeds. *See, e.g., United States v. One 1978 BMW*, 624 F.Supp. 491 (D.Mass.1985) (applying the principles of admiralty and holding that a failure to meet the deadlines of Rule C(6) entitled the government to a default judgment).

**B. The court will grant the United States' motion for summary judgment because the plain language of the relevant statute clearly gives a preferred mortgage priority over all other liens, and because the United States did not engaged in inequitable conduct.**

**1. Under 46 U.S.C. § 31326, a preferred mortgage has priority over all other liens.**

■ A motion for summary judgment should only be granted in cases where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When granting summary judgment, "it

---

2. In addition to the above amount of $15,045,-779.67, the United States claims that it is entitled to interest from July 31, 1992 of roughly $5,100 per day, plus insurance, legal custody, and administrative expenses.

3. An identical case involving another Falcon vessel which received services from Fairway is pending in the Eastern District of Texas. The parties have agreed that the decision in this case will determine the priority of liens in the Texas case.

[should be] perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify application of the law." *Teamsters Joint Council No. 83 v. CenTra, Inc.,* 947 F.2d 115, 119 (4th Cir. 1991). Therefore, the logical starting point in determining the outcome of this motion is the relevant admiralty laws.

Under 46 U.S.C. § 31322 (1988) (a)(1), a preferred mortgage "is a mortgage, whenever made, that—(A) includes the whole of the vessel; (B) is filed in substantial compliance with section 31321 of this title [relating to filing and recording requirements]; covers a documented vessel; ... [and] (D) has as the mortgagee ... the United States ..." *Id.* It is clear to the parties involved that the United States has a preferred mortgage lien on the Pride of Texas. (*See* Stipulation at 3.) Section 31326 of Title 46 states that:

> (a) When a vessel is sold by order of a district court in a civil action in rem brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated ... and the vessel is sold free of all those claims.
>
> (b) Each of the claims terminated under subsection (a) of this section attaches, in the same amount and in accordance with their priorities to the proceeds of the sale, except that—
>
> > (1) *the preferred mortgage lien ... has priority over all claims against the vessel* (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens) ...

*Id.* (emphasis added).

The language taken from § 31326 is directly applicable to the instant case. The Pride of Texas was sold by order of this court in a civil action *in rem* to enforce MARAD's preferred mortgage lien. Both intervenors had claims against the vessel when it was sold on January 8, 1993. The sale of the Pride of Texas extinguished all liens against the vessel and reassigned them to the proceeds according to their original ranking, but *the preferred mortgage lien now has priority over all other claims.*[4]

The intervenors would have the court disregard the language of § 31326. They state that they "do not dispute that summary judgment may be appropriate if this were a simple case of determining statutory priorities." (April 9, 1993, Brief in Opposition to Motion for Summary Judgment at 3.) Intervenors, however, claim that this is not a case where the statute should be applied.

To follow intervenors' rationale would make the language of § 31326 meaningless. While this is not a case of statutory construction, a guiding principle used in such cases is applicable here. As the Supreme Court of the United States has stated "[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms." *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917); *see also Israel v. The Motor Vessel Nili,* 435 F.2d 242, 248 (5th Cir.1970) (quoting Justice Cardozo stating " 'We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it.' ").

The intervenors ask the court to apply the principle of equitable subordination, stating that because of MARAD's inequitable conduct, their liens should be superior to the preferred mortgage. While the court finds that the statutory language should control this situation, it also finds that the affidavits show the government's conduct was not inequitable. While at first glance this may appear to be a factual issue requiring denial of the government's summary judgment motion, the court finds that summary judgment is appropriate. The Supreme Court has noted that:

> While we recognize the importance of preserving litigants' rights to a trial on their

4. It is also worth noting that the preferred mortgage ranks ahead of the intervenors' liens because it predates them.

claims, we are not prepared to extend those rights to the point of requiring that anyone who files [a] ... complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968). Without inequitable conduct by the United States, the intervenors' request for equitable relief must fail as a matter of law.

**2. The conditions which may justify equitable subordination are: control over the debtor, inequitable conduct, injury to junior creditors of the bankrupt entity, and situations where equitable subordination is not inconsistent with federal law.**

■ While equitable subordination is a concept which has more frequently been used in bankruptcy cases, it has also been applied in admiralty cases. There are four conditions which must exist to justify equitable subordination of an otherwise superior claim. First, there must be "a showing that the [superior] claimant is in a position of control over the debtor." *Custom Fuel Services v. Lombas Industries,* 805 F.2d 561, 566 (5th Cir.1986) (footnote omitted). Once this showing is met:

Three conditions are necessary to justify the equitable subordination of an otherwise valid claim:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with [statutory provisions].

*Id.* (alteration in original) (footnote omitted). *See also Wardley International Bank v. Nasipit Bay Vessel,* 841 F.2d 259, 263 (9th Cir.1988) (same). Intervenors, in their own brief, state that "[t]he burden of proof is on the party claiming entitlement to the remedy of equitable subordination to show a substan-

tial factual basis to support the allegation of inequity." (May 13, 1994, Brief in Support of Intervention and Opposition to Summary Judgment at 22 (citing *In re Mobile Steel Co.,* 563 F.2d 692, 701 (5th Cir.1977)).) As the discussion below will indicate, there is not a substantial factual basis for the intervenors' allegations.

**a. MARAD did not control the Falcon Group.**

■ The threshold showing in equitable subordination cases is that the superior claimant is in a position of control over the debtor. However, *Custom Fuel Services, supra,* indicates that there must be a substantial level of dominion over the debtor to warrant equitable subordination. Note the *Custom Fuel* court's analysis of the record in that case:

The record clearly shows that the Bank [whose preferred mortgage was at issue] controls the Subsidiary. The Bank owns all its stock and controls its board of directors. The Subsidiary has no employees of its own.... *The Bank caused the Subsidiary's directors to approve the "purchase" of the vessel and grant the Bank a mortgage in return.*

*Custom Fuel,* 805 F.2d at 566 (emphasis added).

Intervenors state that MARAD "exercise[d] its dominion and leverage beyond what was appropriate for a prudent lender." (May 13, 1994, Brief in Support of Intervention and Opposition to Summary Judgment at 22.) They state that "Falcon could not make a move without MARAD's review and approval" and cite depositions to support their claims. *Id.* But the court's reading of the depositions is that they directly contradict this allegation.

For example, intervenors cite to page 64 of MARAD official James Zok's deposition to support their contentions of control. It reads:

Q. [This document] talks about minimizing foreign lay ups and I take it that was one of the concerns that MARAD had?

A. You and I—we talked about that earlier, the alternative discussions and our problems overseas.

Q. And it seems to indicate that one way to avoid that is to have Falcon secure MARAD consent to all voyage charters. Was that ever done?

A. *To the extent we said, "We want you to take that voyage" or not make that voyage, no not to my knowledge.* Again, I wasn't in all of the meetings. We certainly did voice our opinion about the flexibility we felt that would or would not leave the company if they elected to take those voyages, the risks that were there, whether that appeared to be in the interest of an overall working agreement.

(Zok I at 64 (emphasis added).) In another deposition reads as follows:

Q. And was there ever a time that MARAD or you in particular told [Falcon], No, I don't think you ought to bid on that particular cargo?

A. We never told them not to bid on a particular cargo. We always cautioned them that we didn't want to see them bidding below cost.

(Zok II at 38.) Mr. Zok goes on to state that MARAD's policy toward Falcon was "[n]ot we're going to tell you how to do your business but tell me how you're going to do your business." *Id.* at 40. Several other declarations provide the rationale behind Mr. Zok's statements.

For example, according to Lance Shirley, a former MARAD financial examiner, "[s]ince MARAD is vitally interested in the shipowners' ability to make their loan payments, each Title XI loan agreement requires MARAD's approval on any spending out of a reserve fund." (Shirley Decl. at 3.) This is supported by the deposition of Richard Bowman, a MARAD administrator, stating "we were concerned with protecting our interests with regard to the ship and working with them as reasonable people, but at the same time making sure the government's interests were protected." (Bowman I at 37.) Therefore, according to the depositions which the intervenors cite, and the statements of Mr. Shirley and Mr. Bowman, MARAD was not in control of Falcon. Instead, the administration exercised its ability under the loan agreement to prevent imprudent uses of Falcon's reserve funds.[5]

Therefore, intervenors have failed to make a prerequisite showing of control in their effort to invoke the court's equitable powers. Their allegations in regards to the remaining conditions of equitable subordination also fail.

**b. MARAD did not engage in fraud or any other illegal conduct.**

According to *Custom Fuel*, three types of inequitable conduct are sufficient to warrant subordination. They are: fraud, illegality, or breach of fiduciary duties; undercapitalization; and the creditor's use of the debtor as a mere instrumentality or alter ego. *See Custom Fuel*, 805 F.2d at 566. Fraud and illegality are not issues in this case because MARAD has a valid preferred mortgage under 46 U.S.C. § 31322. Intervenors do not explicitly claim that MARAD had a fiduciary duty to them. Moreover, under bankruptcy law,

[a] creditor will be held to a fiduciary standard only where his ability to command the debtor's obedience to his policy objectives is so overwhelming that there has been, to some extent, a merger of identity. Unless the creditor has become the alter ego of the debtor, he will not be held to an ethical duty in excess of the morals of the market place.

*Waslow v. MNC Commercial Corp. (In re Paolella)*, 161 B.R. 107, 118 (E.D.Pa.1993) (quoting *In re Teltronics Services*, 29 B.R. 139, 171 (Bankr.E.D.N.Y.1983)). As discussed above, MARAD did not exercise the

---

5. Intervenors also inaccurately cite to the depositions. A glaring example is on page 23 of the May 13, 1994, Brief in Support of Intervention and Opposition to Summary Judgment. Intervenors state that "MARAD 'squeezed' Falcon as far as possible," citing Bowman I at 36. In response to a question of whether MARAD had lost faith in Falcon's financial projections Bowman says, "I don't think losing faith in their projections [sic]—I think at the end, just before they filed, *I think at that point we recognized that they had squeezed things as far as they could and there wasn't any more to squeeze out of it." Id.* (emphasis added).

absolute control over Falcon necessary to utilize it as an alter ego. The claim of undercapitalization is a more difficult issue. Undercapitalization can exist in two situations. First, where there is "[i]nsufficient initial capitalization to make a business with the characteristics of the debtor a viable business." *In re Daugherty Coal Company,* 144 B.R. 320, 326 (N.D.W.Va.1992). Second, where there is "[i]nadequate capitalization to obtain equivalent advances from an informed outside lender." *Id.* (citations omitted). Intervenors claim that MARAD's conduct fell within the second category. The thrust of their claim is that by "propp[ing] up Falcon in an attempt to recoup Reserve Funds for years when Falcon could not have obtained additional financing," MARAD was artificially keeping Falcon afloat to the detriment of other creditors. (May 13, 1994, Brief in Support of Intervention and Opposition to Summary Judgment at 24; *see also* July 15, 1994, Reply Brief to United States' Response to Brief in Support of Intervention and Opposition to Summary Judgment at 3.) Assuming this contention to be true, for the following reasons, such conduct would not justify equitable subordination of the preferred mortgage.

Intervenors cite *In re Daugherty Coal Company, supra,* in support of their allegation that MARAD undercapitalized Falcon. In *Daugherty* the liens of the creditor "were obtained shortly before liquidations of a substantial portion of [the debtor's] non-real estate assets." *Id.* at 327. After the creditor obtained his lien, he acquired a security interest in all of the debtor's remaining assets. After examining the creditor's actions, the *Daugherty* court noted:

> The transactions in question were not arm's-length business deals; Appellant attempted to salvage Appellee at a time when Appellee was insolvent and unable to otherwise obtain financing, When losses continued to mount and important assets were being depleted, Appellant obtained the security without going through the appropriate formalities. *In so doing, Appellant obtained liens covering the only significant assets owned by Appellee and effectively "leap-frogged" over Appellee's other creditors.*

*Id.* at 327 (emphasis added). Therefore, even if MARAD propped up Falcon to replenish the reserve fund, this should not have an effect on MARAD's priority under the preferred mortgage. *Daugherty* focused on undercapitalization in order to establish a preference. MARAD's preference was already established by the terms of the mortgage as well as 46 U.S.C. § 31326. Finally, intervenors claim that even if MARAD did not engage in illegal conduct, or undercapitalize Falcon, or use the company as an instrumentality, that courts "have found inequitable conduct without reference to this limiting list." (May 13, 1994, Brief in Support of Intervention and Opposition to Summary Judgment at 15.) However, all of the cases which they cite in support of this contention either fall under the above "limiting list" or do not help their case. *Wardley International Bank v. Nasipit Bay Vessel* dealt with fraud. *See* 841 F.2d at 264 (stating "[p]ermitting Wardley's contrived financial scheme to prevail effectively destroys the liens of suppliers and subverts the purposes of the Maritime Liens Act."). *Maryland National Bank v. The Vessel Madam Chapel,* 821 F.Supp. 1361 (S.D.Cal.1993), bears little if any, resemblance to the instant case. *Madam Chapel* is essentially a chain of title case, which uses equity to uphold the general principle that a good faith purchaser for value takes property free of any liens. *See* 821 F.Supp. at 1367–68. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), and *In re Mobile Steel Co.,* 563 F.2d 692. (5th Cir.1977), address fraud and undercapitalization, respectively. Finally, *Israel v. The Motor Vessel Nili,* 435 F.2d 242 (5th Cir.1970), is a case where the Fifth Circuit strictly applied the relevant statutory language in a mortgage lien case. In view of these opinions, the court will confine its analysis of intervenors' claims to the "limiting list."

### c. MARAD's conduct did not cause injury to the intervenors.

Intervenors claim that by delaying foreclosure on the Pride of Texas, "thus artificially sustaining the vessel financially," MARAD injured them. (May 13, 1994, Brief in Support of Intervention and Opposition to Sum-

mary Judgment at 25.) There are two flaws with this contention. First, intervenors concede that they never ran a credit check on Falcon. (*See* July 15, 1994, Reply Brief to United States' Response to Brief in Support of Intervention and Opposition to Summary Judgment at 6.) Therefore, to a certain extent, they were victims of their own carelessness. Second, even if MARAD's conduct did cause intervenors' losses, "[t]he mere failure of [a creditor] to foreclose on a mortgage in default does not deprive the mortgage of its preferred status." *West of England Ship Owners Mutual Protection and Indemnity Association v. Patriarch Steamship Company,* 491 F.Supp. 539, 545 (D.Mass.1980). In *West of England Ship Owners,* the creditor did not foreclose on the vessel for several years while the mortgage was in default. In the instant case, MARAD foreclosed on the Pride of Texas in approximately seven months.[6] *See also Key Bank of Puget Sound v. Alaskan Harvester,* 738 F.Supp. 398 (W.D.Wash.1989) (distinguishing between a six month lapse between nonpayment on a mortgage and default, and a default of two years, in upholding the priority of a bank's mortgage). For the above reasons, intervenors should not be able to claim that MARAD's conduct caused their injuries.

### d. Equitable subordination is inconsistent with 46 U.S.C. § 31326.

The final condition which, in conjunction with those cited above, may justify equitable subordination of a preferred mortgage is that equitable subordination of the claim must not be inconsistent with relevant statutory provisions. *See Custom Fuel Services, supra.* As stated in section B.1. above, the plain language of § 31326 gives MARAD's mortgage priority. It is clear to this court that subordinating the preferred mortgage would be inconsistent with the statute. Moreover, equitable subordination is a principle taken from bankruptcy law. But unlike the bankruptcy code, § 31326 does not have a specific statutory provision allowing for subordination. *See* 11 U.S.C. § 510(c)(1) (1988) (stat-

ing that, after notice, "the court may ... under the principles of equitable subordination, subordinate ... all or part of an allowed claim ..."). Therefore, intervenors have failed to satisfy the third condition justifying equitable subordination.

### *CONCLUSION*

For the reasons stated above, the United States' motion for a default judgment against the Pride of Texas and any claimants not a party to the instant case is **GRANTED.** The United States complied with the proper arrest and notice requirements and only Fairway and Tomen responded.

The United States' motion for summary judgment is also **GRANTED.** Section 31326 plainly gives MARAD's preferred mortgage priority and the intervenors have not made the substantial factual showing necessary to justify equitable subordination.

The clerk is **DIRECTED** to send a copy of this order to the parties.

It is so **ORDERED.**

---

**6.** The defaults that forced the foreclosure followed the lapse of the Pride of Texas' insurance in February of 1992 and Falcon's failure to pay the vessel's May 1992 mortgage installment.

Foreclosure proceedings began on September 25, 1992. (*See* June 30, 1994 United States' Reply Brief at 13 n. 1.)